**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-4331**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

KELVIN JOHNSON,

Defendant – Appellant.

**No. 19-4338**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

SYKEBIA STEWART,

Defendant – Appellant.

Appeals from the United States District Court for the Northern District of West Virginia, at Martinsburg. Gina M. Groh, Chief District Judge. (3:17-cr-00007-GMG-RWT-1; 3:17-cr-00007-GMG-RWT-2)

Argued: December 11, 2020                    Decided: April 30, 2021

Before GREGORY, Chief Judge, and KING and DIAZ, Circuit Judges.

_____

Vacated and remanded by published opinion. Judge King wrote the opinion, in which Chief Judge Gregory and Judge Diaz joined.

_____

**ARGUED:** Aaron David Moss, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Martinsburg, West Virginia; Edward Ryan Kennedy, ROBINSON & MCELWEE, PLLC, Clarksburg, West Virginia, for Appellants. Timothy David Helman, OFFICE OF THE UNITED STATES ATTORNEY, Martinsburg, West Virginia, for Appellee. **ON BRIEF:** Kristen M. Leddy, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Martinsburg, West Virginia, for Appellants. William J. Powell, United States Attorney, Wheeling, West Virginia, Traci M. Cook, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Clarksburg, West Virginia, for Appellee.

_____

KING, Circuit Judge:

Following a jury trial in June 2018 in the Northern District of West Virginia, defendants Kelvin Johnson and Sykebia Stewart were convicted of distributing heroin that, when used, resulted in the death of 18-year-old Jorge Armando Mercado-Medrano. Johnson was also convicted of a second offense, for distributing heroin to 22-year-old Joel Custer. The district court sentenced Johnson to 365 months in prison and Stewart to 293 months. On appeal, the defendants have raised numerous contentions of error, including arguments related to the Government's failure to disclose and preserve Medrano's cell phone and the prosecution's presentation of evidence that Custer, like Medrano, died soon after using heroin provided by Johnson.

With respect to Medrano's cell phone, we conclude that the district court erred by relying on an incomplete evidentiary record to reject the defendants' claim that the Government's failure to disclose and preserve the cell phone constituted a denial of due process. We also discuss the court's refusal to instruct the jury that it could draw an adverse inference from the loss of the cell phone, but we do not resolve whether the court thereby committed further error. Regarding Custer, we conclude that the court erred in allowing the irrelevant and prejudicial evidence of Custer's death. We therefore vacate the defendants' convictions and sentences, and remand for further proceedings.[1]

---

[1] We have also reviewed — and hereby reject — Stewart's contention that she is entitled to a judgment of acquittal on the basis of insufficient evidence. We do not reach and decide the defendants' other arguments, that the Government's rebuttal closing argument deprived the defendants of a fair trial and that Johnson's sentence is procedurally unreasonable.

I.

A.

In January 2017, the grand jury in northern West Virginia returned its Indictment against Johnson and Stewart. *See United States v. Johnson*, No. 3:17-cr-00007 (N.D. W. Va. Jan. 18, 2017), ECF No. 1. In Count One, Johnson was charged with the distribution of heroin to Custer, in contravention of 21 U.S.C. § 841(a)(1), (b)(1)(C) (the "Distribution Count"). More specifically, the Distribution Count alleges that

> [o]n or about May 28, 2016, in Berkeley County, in the Northern District of West Virginia, defendant KELVIN JOHNSON, did unlawfully, knowingly, intentionally, and without authority distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, to a person known to the Grand Jury.

*See* Indictment 1 (emphasis omitted). In Count Two, Johnson and Stewart were jointly charged with the distribution of heroin that resulted in the death and serious bodily injury of Medrano, in contravention of 21 U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2 (the "Death Count"). For its part, the Death Count alleges that

> [o]n or about May 30, 2016, in Berkeley County, in the Northern District of West Virginia, defendants KELVIN JOHNSON and SYKEBIA STEWART, aided and abetted by each other, did unlawfully, knowingly, intentionally, and without authority distribute a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, to a person known to the Grand Jury and death and serious bodily injury resulted from the use of the heroin.

*See* Indictment 2 (emphasis omitted).

The Death Count contains a statutory enhancement element specifying that "if death or serious bodily injury results from the use of such substance [the defendant] shall be sentenced to a term of imprisonment of not less than [20] years or more than life." *See* 21

4

U.S.C. § 841(b)(1)(C). As a result of that enhancement element, the Death Count provides, upon conviction, for a mandatory minimum sentence of 20 years and a maximum of life. The Distribution Count, on the other hand, does not allege the enhancement element. Thus, the Distribution Count does not have a mandatory minimum sentence and provides for a maximum penalty of 20 years.

B.

Following the return of the Indictment, Johnson and Stewart entered into plea agreements with the United States Attorney. Pursuant to her plea agreement, Stewart agreed to plead guilty to a one-count Information that charged her with the distribution of heroin and did not include the enhancement element for causing death or serious bodily injury. Stewart's plea agreement provided that she would receive a binding sentence of 96 months and that the United States Attorney would recommend dismissal of the Indictment against her. On April 4, 2017, Stewart appeared before a magistrate judge to plead guilty to the Information. The magistrate judge's order related that he "accepted Defendant's plea of guilty and deferred accepting the terms of the plea agreement and adjudicating Defendant guilty." *See United States v. Stewart*, No. 3:17-cr-00026 (N.D. W. Va. Apr. 4, 2017), ECF No. 12.

Two weeks later, on April 18, 2017, Johnson appeared before the magistrate judge to plead guilty to the Distribution Count of the Indictment. Pursuant to his plea agreement, Johnson and the United States Attorney agreed to a binding sentence of 180 months. The United States Attorney also agreed that he would recommend dismissal of the Death Count after Johnson was sentenced on the Distribution Count. The magistrate judge accepted

5

Johnson's plea of guilty to the Distribution Count and deferred to the district court to decide whether to accept the plea agreement and adjudge Johnson guilty.

Following the plea proceedings before the magistrate judge, the district court scheduled the defendants' sentencing hearing for August 7, 2017. At the outset of the August 7 hearing, Stewart's sentencing was continued generally. Turning to Johnson's case, the court rejected his plea agreement. The court ruled that the plea agreement was not "in this community's best interests" and failed to "do justice for these victims [Medrano and Custer]." *See* J.A. 81.[2] After the court rejected the plea agreement, Johnson withdrew his guilty plea without objection.

Several months later, on April 11, 2018, Stewart moved to withdraw from her plea agreement, and the district court conducted a prompt hearing on the issue. Stewart indicated that she did not want to testify against Johnson and desired to go to trial with him on the Death Count of the Indictment. After warning Stewart of the potential consequences of her request, the court allowed Stewart to withdraw from her plea agreement and to

---

[2] In explaining its reasons for rejecting Johnson's plea agreement, the district court cited, inter alia, the Government's failure to consult with Medrano's and Custer's families before offering Johnson the binding 180-month sentence. The court also expressed a belief that Johnson deserved a longer prison term. Although Johnson did not plead guilty to causing Medrano's death and the Government conceded it could not prove causation with respect to Custer's, the court suggested that Johnson should be more severely penalized because he "contribut[ed] to the death of two young men." *See* J.A. 80. In apparent tension with the principle that "[a] court may not enhance a sentence based on bias against out-of-state defendants," *see United States v. McCall*, 934 F.3d 380, 382 (4th Cir. 2019), the court also indicated that Johnson, who resided in Baltimore and travelled about 100 miles to allegedly distribute heroin in West Virginia, merited a harsher penalty for "coming into this state from Maryland and fanning our heroin epidemic," s*ee* J.A. 80. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in these appeals.)

withdraw her guilty plea.  The court also granted the Government's subsequent motion to dismiss the Information against Stewart.

C.

As detailed more fully below, the Government did not recover any of the substance that Johnson and Stewart allegedly sold to Medrano or any of the substance that Johnson allegedly provided to Custer, so the Government has relied on other evidence to prove that each of those substances was heroin.  The Government has also highlighted similarities between the Medrano and Custer cases, including toxicology reports indicating that both Medrano and Custer ingested heroin, among other known and possible drugs.  For their defense on the Death Count, Johnson and Stewart have not disputed that they sold some substance to Medrano — as activities surrounding the sale were documented in a video shared on the social media service Snapchat — but the defendants have disputed that the substance was heroin and that it caused Medrano's death.  With respect to the Distribution Count, Johnson has maintained that he did not provide heroin or any other substance to Custer.

In the pretrial proceedings, it emerged that the Government had been in possession of Medrano's cell phone but did not disclose the cell phone to the defendants.  It was also revealed that the Government returned the cell phone to Medrano's family after the magistrate judge accepted Johnson's plea of guilty to the Distribution Count and before the district court rejected his plea agreement.  Once Johnson knew he was going to trial on the Death and Distribution Counts, he sought the cell phone to support the defense on the Death Count that Medrano's death may have resulted from the use of drugs other than the heroin

7

the defendants allegedly sold him. According to Medrano's father, however, the family misplaced the cell phone after receiving it from the Government and thus could not produce it.

Johnson moved for dismissal of the Death Count on the ground that the Government's failure to disclose and preserve the cell phone constituted a denial of due process. Stewart later joined in that motion, following her decision to withdraw her guilty plea to a simple distribution offense and go to trial with Johnson on the Death Count. On June 18, 2018, the day before the trial began, the district court denied the defendants' motion to dismiss the Death Count after allowing only limited evidence to be presented concerning the contents and disappearance of Medrano's cell phone.

Johnson and Stewart's trial took five days, between June 19 and June 26, 2018. During the trial, the district court denied the request — initially made by Johnson and subsequently endorsed by Stewart — for an instruction on the Death Count that would have advised the jury that it could draw an adverse inference from the Government's loss of Medrano's cell phone. Over Johnson's objection, the court also allowed the Government to present the evidence with respect to the Distribution Count that Custer, like Medrano, died soon after using heroin provided by Johnson.

The jury returned guilty verdicts against Johnson on the Distribution Count and both Johnson and Stewart on the Death Count. In April 2019, the district court sentenced Johnson to 293 months in prison on the Death Count (above the 20-year statutory minimum) and 240 months on the Distribution Count (the 20-year statutory maximum). By designating 72 months of the Distribution Count sentence to be served consecutively to

8

the Death Count sentence, the court imposed the total term of imprisonment of 365 months (more than twice the binding 180-month sentence in Johnson's plea agreement). At a separate hearing, the court sentenced Stewart to 293 months in prison on the Death Count (more than three times the binding 96-month sentence in her plea agreement). The defendants timely noted these appeals, and we possess jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II.

We first address Johnson and Stewart's contentions related to the Death Count and the loss of Medrano's cell phone. The defendants argue on appeal that the Government's failure to disclose and preserve the cell phone contravened their due process rights and deprived them of a fair trial. Additionally, the defendants maintain that — even if the Government's conduct with respect to the cell phone did not rise to the level of a due process violation — the district court erred in refusing to give the jury an adverse inference instruction.

## A.

As a backdrop for our analysis of the defendants' contentions, we begin with a brief discussion of relevant legal principles. Unquestionably, a criminal "defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is . . . material to the guilt of the defendant." *See California v. Trombetta*, 467 U.S. 479, 485 (1984) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). "Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory

9

evidence that would raise a reasonable doubt about the defendant's guilt." *Id.* (citing *United States v. Agurs*, 427 U.S. 97, 112 (1976)). The suppression of material exculpatory evidence violates the right to due process, "irrespective of the good faith or bad faith of the prosecution." *See Brady*, 373 U.S. at 87.

A criminal defendant may prove a due process violation based on the prosecution's failure to preserve evidence if the evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed" and if it is "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *See Trombetta*, 467 U.S. at 489. A showing of bad faith is required, however, when the lost evidence can only be said to be "potentially useful" to the defendant because the contents of the evidence are unknown. *See Arizona v. Youngblood,* 488 U.S. 51, 57-58 (1988) (holding "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law").

Even absent a due process violation, a criminal defendant may be entitled to an adverse inference instruction pursuant to the spoliation of evidence rule. Under that evidentiary rule, "an adverse inference may be drawn against a party who [loses or] destroys relevant evidence." *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995). In order to draw the inference, there must be "a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction." *Id.* at 156.

## B.

With the foregoing legal principles in mind, we turn to a fuller description of the factual and procedural history related to Medrano's missing cell phone.

### 1.

As was eventually clarified during Johnson and Stewart's June 2018 trial, the Government obtained Medrano's cell phone from his father on the day of Medrano's death. Medrano died in his bedroom in his family's Berkeley County home on the morning of May 31, 2016, after allegedly using heroin that he purchased from the defendants the previous night in the defendants' room at a local Motel 6. Under the trial evidence, Medrano and three of his friends used the defendants' heroin — by snorting it — in the same motel room where they acquired it. One of Medrano's friends shared the video on Snapchat that documented activities within the motel room. There was also evidence that Medrano left the motel after midnight with additional heroin that no witness saw him use and that was not recovered. On the basis of that evidence, the Government deduced that Medrano snorted the additional heroin in his bedroom that morning. According to the state autopsy report, Medrano's cause of death was heroin intoxication.

During the initial police response to the Medrano home, Medrano's father provided Medrano's cell phone to Deputy J.M. Whitehead of the Berkeley County Sheriff's Department. Deputy Whitehead then promptly turned the cell phone over to West Virginia

State Police Investigator Brian Bean, who was the principal investigator assigned to the case.[3]

That same day, Investigator Bean interviewed Medrano's girlfriend, who showed Bean the Snapchat video documenting activities within the defendants' room at the Motel 6. Medrano's girlfriend also showed Bean text messages on her cell phone that she and Medrano had exchanged during the early morning hours after Medrano left the motel and before he died. In those texts, Medrano indicated that he was upset and unwell. When pressed by his girlfriend for more information, Medrano responded at 2:28 a.m. that "[t]hey laced something." *See* J.A. 124. He elaborated at 2:46 a.m. — in what we refer to herein as the "'laced blunt' text" — that he had "smoked a lace[d] blunt and didn't know." *See id.*[4]

Investigator Bean preserved images from Medrano's girlfriend's cell phone of the Snapchat video and the text messages, including the "laced blunt" text. Of course, the "laced blunt" text indicated that Medrano used drugs other than the defendants' alleged heroin shortly before his death, as Medrano reportedly snorted the defendants' heroin but smoked the laced blunt. In addition to obtaining the "laced blunt" text, Bean learned from the friends who had been with Medrano on the night of May 30 and in the early morning hours of May 31, 2016, that he had sent multiple texts seeking to purchase drugs from at

---

[3] Investigator Bean was employed with the West Virginia State Police as a civilian investigator. He previously was a trooper with the state police for 25 years.

[4] As explained at trial, a laced blunt is a marijuana cigarette or cigar laced with another drug.

least two sources other than the defendants. Nevertheless, Bean testified at the trial that he never made any effort to review the contents of Medrano's cell phone, by obtaining a search warrant or otherwise. Moreover, both Bean and Deputy Whitehead omitted any mention of the cell phone from their written reports concerning the police response to the Medrano home and investigation of Medrano's death.

2.

At some point, the Government provided Johnson and Stewart with the images preserved by Investigator Bean of the Snapchat video and the "laced blunt" text and other text messages from the cell phone belonging to Medrano's girlfriend. In its discovery disclosures, however, the Government failed to divulge that it was in possession of Medrano's cell phone. Indeed, the Government's initial disclosure of February 15, 2017, made pursuant to Federal Rule of Criminal Procedure 16 and the local rules of the Northern District of West Virginia, asserted that the Government was "unaware of any exculpatory evidence in this matter." *See United States v. Johnson*, No. 3:17-cr-00007, at 3 (N.D. W. Va. Feb. 15, 2017), ECF No. 34. The same disclosure also stated that the "physical exhibits either seized from defendants or which the United States intends to use in its case-in-chief at trial may be viewed by contacting" either Investigator Bean or another named state police investigator. *Id.* at 2.

On September 1, 2017, less than a month after the district court's rejection of his plea agreement, Johnson requested further discovery from the Government, including production of Medrano's cell phone. Because Johnson could only surmise that the cell phone had been secured during the police investigation, he asserted "[u]pon information

13

and belief" that the "Government is in possession of [Medrano's] cell phone." *See* J.A. 117. Johnson specifically sought "disclosure of any forensic analysis of the phone if it exists and the opportunity to have the cell phone produced for independent forensic analysis." *Id.*

In its response of September 13, 2017, the Government acknowledged for the first time that it had possessed Medrano's cell phone. The Government stated, however, that it could not produce the cell phone because it had "been returned to [Medrano's] family." *See* J.A. 120. The Government further responded that it was "not aware of any forensic examination of this object." *Id.*

On March 6, 2018, Johnson filed the motion to dismiss the Death Count, arguing that the Government's failure to disclose and preserve Medrano's cell phone constituted a denial of due process because of the cell phone's exculpatory value. In the alternative, Johnson requested an instruction explaining to the jury that it could draw an adverse inference from the Government's loss of the cell phone.[5] By his motion, Johnson sought an evidentiary hearing regarding the suppression and disposal of the cell phone by the Government.

---

[5] The adverse inference instruction that Johnson requested in the March 2018 motion stated that "[i]f you find that the [government] has . . . allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the [government's] interest." *See United States v. Johnson*, No. 3:17-cr-00007, at 11 n.1 (N.D. W. Va. Mar. 6, 2018), ECF No. 97 (alterations in original) (quoting instruction cited approvingly in *Youngblood*, 488 U.S. at 59-60 (Stevens, J., concurring in the judgment)).

14

Three days later, on March 9, 2018, Johnson filed a motion for a subpoena duces tecum to compel Medrano's parents to produce Medrano's cell phone. Although the district court authorized the subpoena on March 22, 2018, the parents did not produce the cell phone. Thus, on June 1, 2018, Johnson filed a motion for a show cause hearing on the parents' failure to comply with the subpoena.

Also on June 1, 2018, Johnson submitted his proposed jury instructions for the impending trial, which included a revised adverse inference instruction entitled "Missing Evidence." *See United States v. Johnson*, No. 3:17-cr-00007, at 23 (N.D. W. Va. June 1, 2018), ECF No. 202. That proposed instruction stated: "If you find that the government could have produced evidence and that this evidence would have been material in deciding facts in dispute in this case, then you are permitted, but not required, to infer that this evidence would have been favorable to the defendant." *Id.*

### 3.

The district court addressed Medrano's missing cell phone during a show cause hearing and pretrial conference conducted on June 18, 2018.

### a.

During the June 18, 2018 hearing, the district court first took up the motion — brought by Johnson and now joined by Stewart — to dismiss the Death Count based upon the Government's failure to disclose and preserve Medrano's cell phone. With respect to that motion, the district court did not allow the defendants to call and examine any witnesses, including Investigator Bean and Deputy Whitehead. Rather, the court relied on representations of fact made by the prosecutors. The court also heard the parties' legal

15

arguments, which incorporated principles enunciated by the Supreme Court in *Brady*, *Agurs*, *Trombetta*, and *Youngblood*.

(1)

In their presentation, Johnson and Stewart explained that Medrano's cell phone "was not mentioned in the initial Rule 16 discovery at all" and that "[i]t was a scavenger hunt to even figure out that [the Government] had the phone." *See* J.A. 214 (suggesting that Government suppressed material exculpatory evidence in violation of its obligations under *Brady* and *Agurs*). The defendants also asserted that the cell phone's exculpatory value was apparent "on day one of the investigation or shortly thereafter." *Id.* at 205. To support their assertion that the exculpatory value of the cell phone was immediately apparent, the defendants underscored that Medrano's girlfriend showed Investigator Bean text messages on her cell phone that she had just exchanged with Medrano, including the "laced blunt" text indicating that Medrano had used drugs other than the defendants' alleged heroin. The defendants also highlighted that Medrano's friends informed Bean that Medrano had been sending texts seeking drugs from sources other than the defendants.

The defendants summarized that Investigator Bean knew early in the investigation of "drug activity on Mr. [Medrano's cell] phone" that was "different than any activity that was alleged against Mr. Johnson or Ms. Stewart." *See* J.A. 206. According to the defendants, not only was the exculpatory value of the cell phone therefore apparent, but the cell phone "was of such a nature that [the defendants were] unable to obtain comparable evidence by reasonably available means." *Id.* at 207. The defendants argued that, in those circumstances, the Government's failure to disclose and preserve the cell phone

16

contravened their due process rights and entitled them to dismissal of the Death Count. *See id.* (invoking *Trombetta* and contending that the district court did not "even need to get to the bad faith analysis to find the due process violation here").

In any event, the defendants maintained that they could prove bad faith on the part of the Government if such a showing were necessary, i.e., if the district court determined that Medrano's cell phone contained only potentially exculpatory evidence (rather than evidence of apparent exculpatory value). Specifically, the defendants asserted that they could "show that the Government acted in bad faith by its total failure to follow established procedure" in its handling of the cell phone. *See* J.A. 209 (arguing that because they could prove bad faith, they were yet entitled to Death Count's dismissal for denial of due process under *Youngblood*).

To demonstrate the Government's bad faith, the defendants pointed to the following:

- The Government seemingly attempted to "hide" Medrano's cell phone by excluding it from discovery disclosures and omitting it from the police investigation reports, *see* J.A. 205;

- Although cell phones are routinely preserved and analyzed in drug distribution and overdose cases, the Government inexplicably failed to preserve and analyze Medrano's cell phone;

- The Government also failed to preserve and analyze other potentially exculpatory Death Count evidence, including a pipe found in Medrano's bedroom with apparent drug residue;

- Meanwhile, the Government's handling of Medrano's cell phone was markedly different than its by-the-book handling of the cell phone belonging to Custer, the alleged heroin recipient in the Distribution Count against Johnson;

17

- With respect to Custer's cell phone, an investigator wrote a report detailing his receipt of the cell phone from Custer's father, including "how the cell phone was received, who it was received from, when it was received, where it was received, and what was done with it after that receipt," *id.* at 202;

- The investigator requested and obtained a consent to search Custer's cell phone from Custer's father, and the Government then performed a forensic analysis of the cell phone;

- When Custer's cell phone was eventually returned to Custer's father, the investigator documented the return in a property disposition report;

- The Government voluntarily provided Johnson with the documents pertaining to Custer's cell phone, including the investigators' reports, the consent to search, and the forensic analysis;

- The Government's proper handling of Custer's cell phone was similar to its handling of yet another cell phone, belonging to a Distribution Count witness; but

- When it came to Medrano's cell phone, as the defendants stressed to the district court: "[W]e have no reports of investigation. We have no memos in the file. We have no consent to search electronic media. No chain of custody. No property disposition reports. No forensic analysis of that phone," *id.* at 204.

Along with emphasizing the foregoing evidence of bad faith, the defendants requested to call and examine witnesses prior to any ruling on the bad faith issue. The defendants specified that they sought to question Investigator Bean and Deputy Whitehead "to determine exactly why or for what reason . . . no procedure was followed with regard to" Medrano's cell phone. *Id.* at 210.

(2)

In its presentation during the hearing, the Government disclaimed any notion that it suppressed Medrano's cell phone in violation of its obligations under *Brady* and *Agurs*.

18

Rather, the Government submitted that the defendants were to blame for failing to request production of the cell phone before it was returned to Medrano's family. *See* J.A. 210 (asserting that Johnson "had months in which he could have requested the phone" and "obtained an independent examination" but he "[d]id not do so"). Seemingly referring to Medrano's cell phone, the Government also proclaimed — contrary to the record — that "it's clear in the reports that a phone was seized." *Id.* at 215. Otherwise, the Government insisted that its "policy is not to hide evidence" and that it properly placed the onus on the defendants to request to see the cell phone pursuant to the notation in its initial Rule 16 disclosure "that the defense can view physical evidence by calling" Investigator Bean. *Id. But see United States v. Johnson*, No. 3:17-cr-00007, at 2-3 (N.D. W. Va. Feb. 15, 2017), ECF No. 34 (statements in the Rule 16 disclosure that the Government was "unaware of any exculpatory evidence in this matter" and that the defendants could view the "physical exhibits . . . which the United States intends to use in its case-in-chief at trial").

Responding to the defendant's claim under *Trombetta* that the Government deprived them of due process by failing to preserve Medrano's cell phone, the Government maintained that the cell phone had apparent exculpatory value only insofar as it contained the "laced blunt" text. The Government elaborated that because it provided the defendants with comparable evidence — the image of the "laced blunt" text taken from Medrano's girlfriend's cell phone — it did not contravene the defendants' constitutional rights by failing to preserve the "laced blunt" text as it existed on Medrano's cell phone.

According to the Government, all other contents of Medrano's cell phone were unknown and thus just potentially exculpatory evidence for which there could be no relief

19

absent a showing of the Government's bad faith conduct under *Youngblood*. Those contents included the text messages that Medrano's friends said Medrano sent to sources other than the defendants seeking drugs other than the defendants' alleged heroin. With respect to Medrano's texts to other drug sources, the Government acknowledged that the witness testimony that Medrano sent such texts was "not perfect" and not truly comparable evidence to the actual texts that went missing with Medrano's cell phone. *See* J.A. 211-12.

The Government argued, however, that "there's absolutely no bad faith here." *See* J.A. 212. In that regard, the Government advised the district court that Investigator Bean returned Medrano's cell phone to Medrano's family following Johnson's April 2017 guilty plea to the magistrate judge because the family had repeatedly requested the cell phone and Bean "believed the case was over." *Id.* at 211-12. That is, Bean mistakenly believed the court would accept the plea agreement with the binding 180-month sentence and thus returned the cell phone to Medrano's family. The Government offered to call Bean to testify if the court "would like to hear from [him] about when he obtained and returned that phone." *Id.* at 213. Notably, the Government did not provide any explanation or offer any witness as to why the cell phone was not analyzed, why there was no mention of it in the police investigation reports, and why other cell phones, including Custer's, were handled differently.

(3)

Without allowing any witnesses, the district court promptly announced from the bench its denial of the defendants' motion to dismiss the Death Count. In its brief

20

explanation of its ruling, the court provided a single reason for rejecting the claim that the Government unconstitutionally failed to disclose and preserve Medrano's cell phone: the "significant bit of information" that the cell phone was "readily available" for inspection by the defendants from the time of the Indictment in January 2017 until Johnson's guilty plea in April 2017. *See* J.A. 213.

The district court did not mention the circumstances emphasized by the defendants, including that the Government inexplicably opted not to analyze Medrano's cell phone, that the cell phone was conspicuously absent from the Government's discovery disclosures and the police investigation reports, and that the Government had followed different and proper procedures in handling other cell phones in this same case. Furthermore, the court did not squarely address the defendants' suggestion that the Government suppressed Medrano's cell phone in violation of its obligations under *Brady* and *Agurs*, or the defendants' theory that the Government defied *Trombetta* by disposing of the cell phone despite its apparent exculpatory value and the unavailability of comparable evidence.

Rather, the district court only explicitly discussed the defendants' contention that they were entitled to dismissal of the Death Count under *Youngblood* based upon the Government's bad faith conduct in failing to preserve Medrano's cell phone. The court pronounced that because it found there was only "potentially useful evidence on that phone," there was no due process violation absent a showing of bad faith. *See* J.A. 213. And on the bad faith issue, the court determined that the fact that Investigator Bean "held on to [the cell phone] until after [Johnson's] change of plea hearing" precluded any finding that the cell phone "was intentionally withheld for the purpose of depriving the

21

[defendants] of the use of that evidence during [their] criminal trial." *Id.* Strikingly, the court ruled that there was not "even negligent handling of evidence," much less "any bad faith." *Id.* at 213-14.

b.

Later in the June 18, 2018 hearing, the district court dealt with the failure of Medrano's parents to comply with Johnson's subpoena for Medrano's cell phone. On that matter, the court did allow a witness — Medrano's father — who explained that the family "wanted [the cell phone] back for pictures that [Medrano] took and stuff like that." *See* J.A. 255. Medrano's father recounted that once Investigator Bean returned the cell phone, the family "looked through pictures" and then "put [the cell phone] to the side," as they did not "have any use for it." *Id.* at 258. Medrano's father also specified that the family believed "the case was over at that point" and assumed that was "why [they] received the phone back." *Id.*

Sometime after the family set Medrano's cell phone aside, according to Medrano's father, the cell phone was apparently packed with other household items in preparation for the family's move out-of-state later in June 2018. Medrano's father testified that the subpoena prompted him to search through the moving boxes that he deemed most likely to hold the cell phone — boxes being temporarily held in a storage unit and at a relative's house — but he had not found the cell phone during that search.

At the conclusion of Medrano's father's testimony, Johnson argued that the choice not to "look in every box" constituted non-compliance with the subpoena. *See* J.A. 262. The district court ruled, however, that Medrano's parents "complied substantially with

what they were asked to do" and "did not fail to comply with the subpoena for their son's cell phone." *Id.* at 263.[6]

4.

The Government presented evidence at the June 2018 trial that a chance encounter between Medrano and Stewart at a local McDonald's on the night of May 30, 2016, led to Medrano and his friends' purchase of heroin from Johnson and Stewart in the defendants' room at the nearby Motel 6. The Government's evidence was that, while in the motel room, Medrano and three of his friends each snorted about the same amount of heroin, i.e., a single line; Medrano thereafter left the motel with additional heroin that he may have snorted out of the sight of any witnesses. To prove that the substance was actually heroin and that it caused Medrano's death, the Government relied on evidence that, inter alia, Johnson referred to the substance as "boy" (a slang term for heroin), the three friends developed symptoms of heroin intoxication (such as difficulty concentrating, drowsiness, and vomiting) while still at the motel, and two of the friends were subsequently hospitalized.

In response, the defendants highlighted evidence suggesting that their substance was not heroin and that Medrano's death and his friends' hospitalizations were caused by heroin or other drugs obtained from other sources. That included evidence that the non-hospitalized friend felt well enough to go to school the next day, one of the two hospitalized

---

[6] During the June 18, 2018 hearing, the district court indicated that it would withhold ruling on Johnson's request for an adverse inference instruction related to Medrano's missing cell phone until the court heard the trial evidence.

23

friends tested negative for heroin, and Medrano himself showed no signs of heroin intoxication at the Motel 6. To the contrary, Medrano was described as being "really hyped up," *see* J.A. 1086, and he drove without apparent difficulty over the 60- to 90-minute period after he left the motel, dropping off two of the friends at two different locations, driving others to a restaurant for breakfast, and then heading home. Taking into account that both Medrano and the second hospitalized friend tested positive for heroin, a defense theory was that Medrano and that friend used heroin together after leaving the motel, perhaps by way of the laced blunt referenced in the "laced blunt" text Medrano sent his girlfriend; that such heroin had been acquired from a local drug dealer Medrano had reportedly been texting; and that the friend was concealing the real source of the heroin to protect himself and the local drug dealer, who was so close to the friend that he had been living with the friend's family.

During the trial, Investigator Bean finally testified about his receipt and possession of Medrano's cell phone. On cross-examination, Bean admitted that he was aware early in the investigation that the cell phone contained evidence that Medrano used drugs other than the defendants' alleged heroin prior to his death on the morning of May 31, 2016. That evidence included the "laced blunt" text from Medrano to his girlfriend, plus Medrano's friends' reports that Medrano had sent multiple text messages to drug sources other than the defendants. The defense elicited that, despite Bean's possession of Medrano's cell phone and knowledge of evidence contained therein, Bean did not "attempt to do any analysis of that phone" and did not "look[] into that phone" in an effort "to follow any of those leads." *See* J.A. 856.

24

The defense also prompted Investigator Bean to agree that proper investigatory procedures include "document[ing] the evidence that you find." *See* J.A. 845. When asked by the defense, "If you don't write something down, it didn't happen," Bean responded, "That's correct, sir." *Id.* at 846. Bean was subsequently compelled to admit, however, that his "investigation report doesn't mention [Medrano's cell] phone." *Id.* at 856.

Significantly, the defense did not question Investigator Bean about the Government's failure to preserve Medrano's cell phone, apparently out of concern that the district court would allow Bean to inform the jury that the cell phone was returned to Medrano's family following Johnson's prior guilty plea. *See* J.A. 839 (bench conference discussion as to whether cross-examination about the cell phone would "open the door to the plea"). That tactic proved to be troublesome for the defendants with respect to the pending request for an adverse inference instruction. Specifically, during the charge conference at the close of the Government's case-in-chief, Johnson and Stewart jointly argued that the court should instruct the jury that it could draw an adverse inference from the loss of the cell phone. But the court observed that the jury had not been presented with any evidence of the Government's failure to preserve the cell phone and that "the explanation as to why it doesn't exist now would be highly prejudicial to" Johnson. *Id.* at 1244-45.

The district court ultimately resolved not to give an adverse inference instruction, broadly citing "what I've heard at trial and what we've discussed at the [June 18, 2018] hearing." *See* J.A. 1246-47. The court did accord the defendants an instruction regarding "weaker or less satisfactory evidence," based on the Government's failure to analyze

25

(rather than to preserve) Medrano's cell phone. *See id.* at 1247-48. That instruction stated: "If a party offers weaker or less satisfactory evidence when stronger and more satisfactory evidence could have been produced at trial, you may, but are not required to, consider this fact in your deliberations." *Id.* at 1385. The jury thereafter found the defendants guilty of the Death Count, having discerned no reasonable doubt that the defendants sold heroin to Medrano and that the defendants' heroin was a but-for cause of Medrano's death.

C.

Reiterating the arguments they made in the district court in seeking dismissal of the Death Count, Johnson and Stewart now urge this Court to rule that the Government contravened their due process rights and deprived them of a fair trial by failing to disclose and preserve Medrano's cell phone. Alternatively, the defendants would have us rule that the district court erred in refusing to give the jury an adverse inference instruction concerning the Government's loss of the cell phone.

1.

In support of their due process claim, Johnson and Stewart invoke *Brady* and contend that the Government "suppressed [Medrano's] cell phone, either willfully or inadvertently." *See* Br. of Appellants 16-17 (citing *Brady*, 373 U.S. at 87). The defendants also argue that the Government violated its obligation under *Agurs* to disclose the cell phone — as material exculpatory evidence — even in the absence of the defendants' request for it. *See id.* at 18 (emphasizing that the Government has "a duty to disclose evidence 'obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request'" (quoting *Agurs*, 427 U.S. at

26

110)). In the defendants' words, *Agurs* "protects against" what seemingly occurred here: "police and prosecutors hiding exonerating evidence." *See id.* Regardless of whether the suppression of the cell phone was intentional, however, the defendants insist they are entitled to relief. *See Holdren v. Legursky*, 16 F.3d 57, 60 (4th Cir. 1994) (explaining that under *Brady* and *Agurs*, "the government has a duty to disclose material exculpatory evidence to the defendant, and the good faith or bad faith of the government in failing to do so is irrelevant").

Johnson and Stewart further contend in support of their due process claim that the Government unconstitutionally failed to preserve Medrano's cell phone. The defendants argue for relief pursuant to both *Trombetta*, 467 U.S. at 489 (requiring that lost evidence have apparent exculpatory value and that comparable evidence be unavailable), and *Youngblood*, 488 U.S. at 58 (allowing lost evidence to be just potentially useful but only with showing of Government's bad faith). Under *Trombetta*, the defendants maintain that the cell phone's exculpatory "value was apparent from the start of [the] investigation" into Medrano's death and that the cell phone "was of such a nature that it can never be duplicated." *See* Br. of Appellants 23. With respect to *Youngblood*, the defendants assert that — "even if this Court somehow finds that [the cell] phone only possessed potentially material exculpatory evidence" — "this case would still call for a finding of a due process violation because the failure to preserve [the cell phone] was caused by bad faith actions." *Id.*

On the bad faith issue, Johnson and Stewart complain that the district court did not allow them to examine Investigator Bean and other witnesses during the June 18, 2018

27

hearing before finding no bad faith conduct by the Government and rejecting the defendants' due process claim under *Youngblood*. Nevertheless, the defendants contend that we can award them relief in these appeals based on existing evidence of bad faith, including Bean's June 20, 2018 trial testimony admitting that he knew Medrano's cell phone contained evidence of recent drug activity yet he neither analyzed the cell phone nor documented that the Government possessed it.

As we see it, however, the evidentiary record is too meager to render a proper ruling on Johnson and Stewart's due process claim. And the deficiency of the record is not limited to the *Youngblood* bad faith issue; it also inhibits the application of *Brady*, *Agurs*, *Trombetta*, and the potentially-useful-evidence standard of *Youngblood*. Consequently, we must conclude that the district court erred by rejecting the defendants' claim in reliance on an incomplete record — a record that was even more inadequate at the time of the district court's ruling than it is now that it includes the trial evidence.

Simply put, much remains unknown regarding the circumstances of the Government's failure to disclose and preserve Medrano's cell phone. For example, even if Investigator Bean did not review the contents of the cell phone, did Deputy Whitehead or another police officer or a prosecutor or witness do so? What did Medrano's family see on the cell phone when they looked through its photographs? What is Bean's sworn explanation for returning the cell phone to Medrano's family? Did Bean actually believe the case was over because Johnson had entered a guilty plea to the Distribution Count? Did Bean consider that Johnson's plea agreement had not been accepted by the district court and that the Death Count remained pending? Did Bean consider Stewart and the

28

pendency of the Death Count as to her? Did it concern Bean that there had not been any convictions, sentencings, or appeals in the case? Did Bean consult the prosecutors or other police officers before returning the cell phone to Medrano's family? Did Bean dispose of additional Death Count evidence or only the cell phone?

These are important questions that need to be answered in order for a fair and appropriate analysis of Johnson and Stewart's due process claim to be conducted. Thus, we cannot ratify the district court's approach of disallowing witnesses and then relying on the limited evidentiary record to reject the defendants' claim.

Indeed, we also have doubts about the merits of the district court's decision. Specifically, we are troubled by the court's narrow focus on *Youngblood* and the court's ruling that Investigator Bean acted neither in bad faith nor even negligently in returning Medrano's cell phone because he "held on to it until after [Johnson's] change of plea hearing." *See* J.A. 213-14. It confounds us how the court could accept it as reasonable for Bean to believe the case was over upon Johnson's guilty plea to the Distribution Count, but unreasonable for Johnson not to request the cell phone as evidence on the Death Count prior to the court's rejection of his plea agreement. We are also troubled by the court's pronouncement that there was only "potentially useful evidence on that phone," *id.* at 213, as the Government conceded that the cell phone had at least some content with apparent exculpatory value, i.e., the "laced blunt" text indicating that Medrano smoked a laced blunt in addition to snorting the defendants' alleged heroin shortly before his death.

In any event, the district court will have the opportunity to reassess Johnson and Stewart's due process claim with the expansion of the evidentiary record on remand. We

29

fully expect that the additional evidence — including evidence elucidating Investigator Bean's decision to return Medrano's cell phone and delineating the cell phone's known and suspected contents — will enable a thorough analysis of the due process claim that includes a careful application of the principles of *Brady*, *Agurs*, *Trombetta*, and *Youngblood*. Such an analysis is plainly merited, as the defendants have stated a plausible claim that the Government's failure to disclose and preserve the cell phone has impeded their ability to defend themselves on the Death Count by showing that drugs other than the defendants' alleged heroin may have caused Medrano's death. Although the defendants would be entitled to due process with respect to any criminal charge, it bears repeating that the Death Count carries a mandatory sentence of 20 years to life.[7]

2.

Because we conclude that the district court erred by relying on an incomplete evidentiary record to reject Johnson and Stewart's due process claim, we need not decide whether the court committed further error with respect to the Death Count by refusing to instruct the jury that it could draw an adverse inference from the Government's loss of

---

[7] We also emphasize that our identification of questions that need to be answered is not meant to circumscribe in any way the district court's expansion of the evidentiary record. For example, further lines of inquiry may emerge as evidence is developed on the contents of Medrano's cell phone, Investigator Bean's return of the cell phone to Medrano's family, and the involvement of any prosecutors or other police officers with the Government's possession and disposal of the cell phone. Additional questions have arisen in these proceedings regarding whether the cell phone may have contained impeachment evidence and whether Medrano's family gave the police investigators a second cell phone. It is also possible that the family has now found and can produce the cell phone (or cell phones).

Medrano's cell phone. We observe, however, that if on remand the court rejects the defendants' due process claim again and conducts a retrial, the court should assess anew whether the defendants are entitled to an adverse inference instruction.

As explained in our *Vodusek* decision, an adverse inference instruction may be appropriate under the evidentiary rule relating to spoliation of evidence. *See* 71 F.3d at 155. That is, "an adverse inference may be drawn against a party who [loses or] destroys relevant evidence" where there is "a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction." *Id.* at 155-56. In light of the "willful conduct" requirement, the mere "negligent loss or destruction of evidence" is an insufficient basis for an adverse inference. *Id.* at 156. Meanwhile, "a finding of bad faith suffices to permit such an inference" but "is not always necessary." *Id.* At bottom, there simply needs to be a showing that the party's "intentional conduct contribute[d] to the loss or destruction of [the] evidence." *See id.*; *see also Buckley v. Mukasey*, 538 F.3d 306, 323 (4th Cir. 2008) (explaining that the spoliation of evidence, "though not conducted in bad faith, could yet be intentional, willful, or deliberate" and therefore support an adverse inference instruction (internal quotation marks omitted)).

Notably, the decision to give an adverse inference instruction is "at the discretion of the trial court." *See Vodusek*, 71 F.3d at 155. Nevertheless, the court abuses its discretion in disallowing an adverse inference instruction where the instruction is "correct," is "not substantially covered by the charge" given to the jury, and "involve[s] some point so important that the failure to give the instruction seriously impair[s] the defendant's defense." *See United States v. Bartko*, 728 F.3d 327, 343 (4th Cir. 2013).

31

Here, during the June 2018 trial, the district court denied Johnson and Stewart's request for an adverse inference instruction after observing that the jury had not been presented with any evidence of the loss of Medrano's cell phone and that the Government's explanation for that loss (that Investigator Bean returned the cell phone to Medrano's family following Johnson's guilty plea) would be "highly prejudicial" to Johnson. *See* J.A. 1244-45. The court also suggested that the instruction was inappropriate for other reasons, in that it broadly cited "what I've heard at trial and what we've discussed at the [June 18, 2018] hearing." *See id.* at 1246-47. As an alternative to the proposed adverse inference instruction, the court gave an instruction regarding "weaker or less satisfactory evidence," based on the Government failure to analyze the cell phone. *See id.* at 1247-48.

Upon any retrial on remand, the district court should entertain ways to inform the jury of the Government's loss of Medrano's cell phone without revealing Johnson's guilty plea so that an adverse inference instruction may be given. The court should also consider that the existing record reflects the following: that Investigator Bean has admitted knowing early in the investigation that the cell phone contained evidence relevant to the issue of whether Medrano's death resulted from the use of Johnson and Stewart's alleged heroin or other drugs from other sources; that despite his knowledge of the cell phone's evidentiary value, Bean intentionally returned the cell phone to Medrano's family after opting not to analyze it; and that the family then misplaced the cell phone, preventing the defendants from presenting the cell phone's lost contents to establish a reasonable doubt that their alleged heroin was a but-for cause of Medrano's death. Finally, to the extent that the court may be inclined to again charge the jury as it did during the June 2018 trial, the court should

32

consider whether an instruction on weaker or less satisfactory evidence — being based on the Government's failure to analyze the cell phone, with no explanation to the jury that the cell phone is now lost and cannot be analyzed by the defendants or anyone else — is truly an adequate substitute for an adverse inference instruction.

## III.

We next address Johnson's appellate contention with respect to Custer, the alleged heroin recipient in the Distribution Count. Johnson argues that the district court erred in allowing the Government to present trial evidence that Custer, like Medrano, died soon after using heroin provided by Johnson.

## A.

### 1.

Under the Government's theory of the Distribution Count, Johnson provided heroin to Custer during a chance encounter at Vixens Gentleman's Club in Berkeley County on the night of May 28, 2016 — two nights before Johnson and Stewart's alleged sale of heroin to Medrano. According to the Government, Custer was seen snorting a substance given to him by Johnson in the Vixens outdoor smoking area, soon developed symptoms of heroin intoxication, and died in the early morning hours of May 29. Because the state autopsy report attributed Custer's death to the combined effects of heroin, oxycodone, and alcohol, the Government charged Johnson with simple distribution of heroin to Custer, without the enhancement element for causing death or serious bodily injury.

In April 2018, prior to the trial, the Government filed a motion in limine seeking to introduce evidence of Custer's "use of the substance provided by Johnson and his death early the following morning." *See United States v. Johnson*, No. 3:17-cr-00007, at 1 (N.D. W. Va. Apr. 3, 2018), ECF No. 136. The motion acknowledged that the Distribution Count "does not allege that death resulted from the use of [Johnson's] heroin." *Id.* The motion explained, however, that because "law enforcement did not recover any heroin," the Government needed to rely on circumstantial evidence that it was heroin that Johnson provided to Custer. *Id.* at 3. That circumstantial evidence included "testimony about how [Custer's] body reacted after using the substance" and "testimony about the toxicology results and cause of death." *Id.* at 3-4.[8]

The district court took up the Government's motion in limine during the hearing on June 18, 2018, the day before the trial began. Johnson immediately agreed to stipulate to Custer's toxicology report and not to contest other evidence of Custer's physical state, so long as there was no "mention of death and that heroin was any part of that." *See* J.A. 216-17; *see also id.* at 223-24 (elaborating that Johnson would agree to evidence that blood and urine samples were collected from Custer "when he was taken to the hospital" but not "that it was done as part of an autopsy").

In response, the Government emphasized that it could not "prove that Mr. Custer died as a result of heroin intoxication" and that it did not "intend to imply that he died as a

---

[8] In the alternative, the Government asserted in its motion in limine that the evidence of Custer's death was admissible under *United States v. Kennedy*, 32 F.3d 876, 886 (4th Cir. 1994), to provide context to the Distribution Count and "complete the story."

result of heroin intoxication." *See* J.A. 223. Nevertheless, the Government insisted that it yet needed to present evidence of Custer's death to explain to the jury why Custer was not testifying at the trial. The Government asserted that Custer's unexplained absence could "look[] bad for the Government" and lead the jury to speculate that Custer was "not comfortable with what's going on in [the] courtroom" and that the Government was "trying to hide something" and had "messed something up." *Id.* at 229. The Government expressed a preference for the admission of evidence that Custer died shortly after using heroin provided by Johnson, while proposing in the alternative that the jury be informed that Custer was "unavailable because he's deceased" without "disclos[ing] when he died." *Id.*

After hearing the parties' arguments, the district court ruled that the Government could present evidence along the lines agreed to by Johnson — that is, evidence of Custer's toxicology report and physical state after using Johnson's alleged heroin — but not evidence of Custer's contemporaneous death. The court specified that because "the Government can't prove and thus it didn't charge that Mr. Custer died as a result of the heroin he ingested that was allegedly distributed to him by Mr. Johnson," the court was "not going to permit the mention of the death of Mr. Custer in that context." *See* J.A. 232-33. Recognizing "the problem for the Government in not presenting a witness in a charge this significant," however, the court further ruled that the Government would be allowed "to mention one time to the jury that Mr. Custer [was] unavailable because he's deceased." *Id.* at 233.

35

The district court also addressed the potential prejudice to Johnson of admitting evidence of Custer's death. On the one hand, the court reasoned that Johnson would not be prejudiced by a single mention of Custer's death meant to explain Custer's absence from the trial, as the jury was "going to understand that Mr. Custer was an addict" and thus would not "think anything of the fact that Mr. Custer is deceased." *See* J.A. 233. On the other hand, the court cautioned that "we need to make sure . . . that the Government and the defendant instruct all their witnesses that there won't be any mention that Mr. Custer's death was in any way related to [the Distribution Count]." *Id.*

2.

On the first day of the June 2018 trial, the first prosecution witness on the Distribution Count — a friend of Custer's brother — testified to driving in a truck to Vixens for a celebration on the night of May 28, 2016, with a group of men that also included Custer, Custer's brother, their cousin, and Custer's best friend. The brother's friend described intermittently encountering Johnson in the Vixens outdoor smoking area, including times when Custer was also present. Although the brother's friend did not claim to witness the transaction alleged in the Distribution Count, he did testify that Custer's "demeanor started to change" "a couple hours into the night." *See* J.A. 513. Specifically, Custer "started dropping his head a lot like he was falling asleep, passing out type of thing. Slurring his words a lot. Saying that he just wanted to go to the truck and sleep." *Id.* According to the brother's friend, who had been trained to identify the effects of controlled substances in his work as a correctional officer, it "appeared that [Custer] was on some sort of downer drug." *Id.* at 514.

36

Custer's brother's friend testified that he and two other group members eventually escorted Custer as he walked to the group's truck in the Vixens parking lot to sleep. Because Custer said that "[h]e didn't want [his companions] to end the night on account of him," the men left Custer in the parking lot, reentered Vixens, and stayed for several more hours, until "close to" the club's 3:00 a.m. closing time. *See* J.A. 516. The brother's friend indicated that when he and the other group members then returned to the truck, they discovered that Custer needed medical attention and called for an ambulance that took Custer from the scene.

On cross-examination, the defense elicited from Custer's brother's friend that there are a variety of "downer" drugs — including, but not limited to, heroin, oxycodone, and alcohol — that could have caused Custer's symptoms. *See* J.A. 546-47. The defense also confirmed that the brother's friend did not "see Mr. Custer using drugs," "see any distribution occur," or "know anything about the drugs Mr. Custer had," such as "what type of drugs," "what color the drugs were," "how many drugs," or "how the drugs were packaged." *Id.* at 547. Thereafter, the defense specifically elicited that the brother's friend did not know whether Custer "used" or "was given any drugs at Vixens." *Id.* The defense then turned to the hours that Custer spent in the Vixens parking lot, with the following line of questioning:

Q. You don't know what he was doing out in that parking lot?

A. I do not.

Q. You don't know who he might have spoken to out in that parking lot?

A. I do not.

37

Q. You don't know if he got any drugs from anyone out in that parking lot?

A. Correct.

*Id.* at 548.

At that point in the cross-examination, the Government requested a bench conference and argued that the foregoing line of questioning had "opened the door on the death of Mr. Custer." *See* J.A. 549. The prosecutor asserted that she knew from a pretrial conversation with Custer's brother's friend that he believed Custer had died by the time he was found in the truck around Vixens' closing time. *See id.* ("When this particular witness went out to the parking lot, [Custer's] lips were purple. He was ashen gray. And based on [the witness's] training and experience . . . , he believes [Custer] was deceased at that point in time."). The prosecutor also stated that evidence that Custer died in the parking lot had been available to the defense. From there, the prosecutor contended that — by implying that Custer had been "out there walking around finding drugs" while his companions were inside Vixens — the defense opened the door to the evidence that Custer had actually spent that time going from "[s]ick to dead." *Id.* at 551.

The defense countered that it simply "opened the door that [Custer] was out there for a number of hours without any supervision, without any witnesses seeing him." *See* J.A. 551. The district court, however, agreed with the Government that the defense had opened the door to evidence that Custer died that morning in the Vixens parking lot. The court briefly explained: "But [the defense] did imply and I so find that [Custer] was out there doing something else or could have been doing something else. I find the door has

38

been opened, and the Government can proceed." *Id.* The court then withdrew its previous day's ruling allowing just one mention of Custer's death and permitted the Government to inform its witnesses that they were now free to discuss the death in their testimony.

3.

Following the bench conference, the Government focused its redirect examination of Custer's brother's friend on seeing Custer in the Vixens parking lot in the early morning hours of May 29, 2016. The brother's friend testified that Custer "was unconscious. He wasn't breathing. His lips were blue. Pale skin." *See* J.A. 554. The brother's friend also stated that "CPR was being administered" to Custer in the parking lot, first by Custer's cousin and then by an "off-duty EMS person," until "the ambulance showed up." *Id.* The brother's friend described Custer as having "asphyxiated on himself," *id.*, but did not explicitly state an opinion that Custer was dead in the parking lot.

Subsequent witnesses confirmed that Custer died that morning without pinpointing a time or place of death. Custer's cousin testified that he and Custer's brother had periodically checked on Custer during the hours after he went to the Vixens parking lot to sleep in the truck and before the club's closing time. On direct examination by the Government, the cousin stated that he did not see Custer "talking to anyone else" or "obtaining substances from anyone" during those checks. *See* J.A. 783. In the cousin's words, that was because when he checked on Custer in the parking lot, Custer "was sleeping or he was dead. One or the other." *Id.* Meanwhile, Custer's best friend testified to learning only after Custer reached the hospital that he was dead. *See id.* at 721 ("The doctor came in and told us that he didn't make it. He died.").

39

In addition to the evidence of Custer's death, the Government presented the testimony of Custer's best friend that on the night of May 28, 2016, he saw Johnson hand Custer a gum wrapper and Custer snort the gum wrapper's contents while Johnson and Custer were interacting in the Vixens outdoor smoking area. The best friend did not see what was inside the gum wrapper but noticed a short time later that Custer began nodding off and having trouble maintaining a conversation and holding his cigarette (signs of possible heroin intoxication). A dancer at Vixens testified for the Government that she saw Johnson that night with a plastic bag containing a powdery substance and he offered her "rock" and "dog food" (like "boy," slang terms for heroin). Other prosecution witnesses noted Custer's symptoms of heroin intoxication, which also included vomiting. And video recordings from some of Vixens' surveillance cameras showed Johnson and Custer interacting, albeit without clearly documenting the heroin transaction alleged in the Distribution Count.

The defense responded to the Government's case by not only questioning Custer's best friend's testimony that Johnson provided some substance to Custer, but also by contesting that any substance provided by Johnson was undoubtedly heroin. In that regard, the defense highlighted evidence that Custer's symptoms after allegedly snorting Johnson's substance were not exclusive to heroin intoxication; that Custer's toxicology report was positive for more drugs than heroin; that Custer may have used heroin before going to Vixens, brought it with him, or obtained it there from a source other than Johnson; that heroin and other drugs were regularly sold and used at Vixens; that several of the prosecution witnesses, including some of Custer's companions, used heroin and other

40

drugs; and that Custer was not constantly monitored by his companions or the Vixens surveillance cameras.

Thereafter, in its closing argument, the Government emphasized similarities between Medrano and Custer, including that "both of them within the span of two days had chance encounters with Kelvin Johnson" and that "[b]oth of them had heroin in their system." *See* J.A. 1299. The Government also urged the jury to rely on the Death Count evidence to find Johnson guilty of the Distribution Count for providing heroin to Custer, and to rely on the Distribution Count evidence to find Johnson and Stewart guilty of the Death Count for selling heroin to and thereby causing the death of Medrano. As the Government explained to the jury, "you've seen evidence about the distribution [to Custer] on May 28th, and you've seen evidence about the distribution [to Medrano] on May 30th. But you don't need to compartmentalize it that way." *Id.* at 1303. The jury then returned a verdict against Johnson on the Distribution Count, along with its verdict against Johnson and Stewart on the Death Count.

## B.

We review for abuse of discretion the district court's admission of the evidence of Custer's death. *See United States v. Alvarado*, 840 F.3d 184, 188 (4th Cir. 2016) ("This court reviews a district court's evidentiary rulings for abuse of discretion."). The district court abused its discretion if it rested its ruling — that the defense opened the door to evidence that Custer died on the morning of May 29, 2016, in the Vixens parking lot — "on erroneous factual or legal premises." *See id.* at 189 (internal quotation marks omitted). Even if the evidence was admitted in error, we will not vacate Johnson's conviction of the

41

Distribution Count if the error was harmless. *See* Fed. R. Crim. P. 52(a) ("Any error . . . that does not affect substantial rights must be disregarded."). In order to deem the district court's "evidentiary ruling to be harmless, we must find that the judgment was not substantially swayed by the error." *See United States v. Johnson*, 617 F.3d 286, 295 (4th Cir. 2010).

On appeal, Johnson argues that the defense did not open the door to "unfettered evidence" of Custer's death and that the district court thus abused its discretion in allowing such irrelevant evidence. *See* Br. of Appellants 29-30. Johnson further contends that the error was not harmless, in that "little is more prejudicial than allowing the inference that Johnson is also somehow guilty of the uncharged death of Custer, while on trial for distributing heroin to Custer." *Id.* at 30 (citing *United States v. Wilson*, 135 F.3d 291, 299 (4th Cir. 1998), for the proposition that "it is hard to fathom anything more prejudicial than the unproved assertion that the accused is also guilty of the uncharged crime of murder while he is on trial for another offense"). According to Johnson, there is a high probability that the jury convicted him of the Distribution Count "not because it weighed the evidence for proof of distribution of heroin, but because it believed that [his] actions somehow contributed to Custer's death." *Id.*

For its part, the Government asserts on appeal — as it successfully did at trial — that the defense opened the door to the evidence of Custer's death by suggesting in its cross-examination of the first Distribution Count witness (Custer's brother's friend) that Custer may have obtained drugs in the Vixens parking lot after being left there by his companions. The Government maintains that the defense thereby misled the jury, in that

42

the defense falsely implied that "Custer was physically able to seek out drugs while in the parking lot" and "could have been doing something other than dying." *See* Br. of Appellee 35. Accordingly, the Government insists that the district court properly admitted the evidence of Custer's death for the purpose of "correcting the [defense's] deception." *See id.* at 33 (citing *United States v. McLaurin*, 764 F.3d 372, 383 (4th Cir. 2014), for the proposition that "[a] district court may allow testimony on redirect which clarifies an issue which the defense opened up on cross-examination even when this evidence is otherwise inadmissible" (internal quotation marks omitted)).

Notably, the Government does not contend that the evidence of Custer's death was admissible for any other reason, including any reason it advanced prior to the trial, when the district court initially excluded the evidence (except for a single mention of Custer's death) as irrelevant and unduly prejudicial. Moreover, the Government does not argue that if the evidence was admitted in error, the error was harmless.

Upon careful review of the record, we conclude that the district court erred in freely admitting evidence of Custer's death, i.e., in ruling that the defense opened the door to evidence that Custer died on the morning of May 29, 2016, in the Vixens parking lot. That is so because the court's ruling rested on unsubstantiated premises: that Custer's death occurred in the parking lot and that his death precluded any possibility that he obtained drugs in the parking lot during the hours that he was left there unattended.

First of all, although the prosecutor proffered to the district court that Custer's brother's friend believed Custer died in the parking lot — and although the prosecutor indicated that she needed to present such evidence to the jury to correct any misperception

that Custer had been physically capable of finding drugs there — the Government made no apparent effort to elicit that opinion from the brother's friend in his subsequent testimony. The Government thereafter prompted other witnesses to testify that Custer died on the morning of May 29, 2016, but did not ask the witnesses to pinpoint a time or place of Custer's death.

More importantly, the Government presented no evidence that Custer's death — whether it occurred in the parking lot or later in the ambulance or at the hospital — rendered it an impossibility that Custer could have obtained drugs in the parking lot in the hours after some of his companions escorted him to the truck and left him alone there. That is, contrary to the Government's assertions to the district court and this Court, there is no proof that it is impossible that Custer "could have been doing something other than dying." *See* Br. of Appellee 35. At most, the Government demonstrated at trial that Custer's death made it unlikely that Custer was physically capable of finding drugs in the parking lot. But the Government did not need the evidence of Custer's death to make that showing, as it could have made the same showing with the evidence that Custer was eventually found unconscious and taken to the hospital by ambulance. And in any event, there was no false implication or deception for the evidence of Custer's death to correct.

In addition to concluding that the district court therefore erred in ruling that the defense opened the door to the evidence of Custer's death, we conclude that the court's error was not harmless. The court itself initially recognized that the evidence of Custer's death was not only irrelevant, but also unduly prejudicial. As Johnson argues, there is a significant likelihood that — rather than carefully weighing the evidence of heroin

44

distribution — the jury was inflamed to convict him of the Distribution Count to punish him for somehow contributing to Custer's death. *Cf. Wilson*, 135 F.3d at 300 ("Here, there is a serious risk that the jury decided to convict [the defendant] simply because it believed he was a murderer, not because it weighed the evidence for proof of drug conspiracy and possession, the crimes actually charged.").[9]

Our concern about the prejudicial impact of the evidence of Custer's death extends to the Death Count. As reflected herein, the Government lacked strong and undisputed evidence that the substance allegedly distributed in the Death and Distribution Counts was heroin. Consequently, the Government urged the jury to return guilty verdicts on those charges based on similarities between Medrano and Custer. To be sure, the evidence that both Medrano and Custer died is a similarity that may have caused the jury to overlook weaknesses in the evidence and to convict Johnson and Stewart of the Death Count and Johnson of the Distribution Count. We thus cannot say that the jury's verdicts were not substantially swayed by the erroneous admission of the evidence of Custer's death.

---

[9] The district court might have ameliorated the prejudice associated with the evidence of Custer's death by giving the jury a limiting instruction. While courts normally have no obligation to provide such an instruction absent a request by the parties, *see United States v. Johnson*, 945 F.3d 174, 178 (4th Cir. 2019), *cert. denied*, 141 S. Ct. 255 (2020), they may nonetheless do so sua sponte, *see United States v. Hager*, 721 F.3d 167, 203 (4th Cir. 2013). And we have long held that "'cautionary or limiting instructions generally obviate' prejudice" that certain evidence may generate. *See United States v. Cowden*, 882 F.3d 464, 473 (4th Cir. 2018) (quoting *United States v. Powers*, 59 F.3d 1460, 1468 (4th Cir. 1995)). Our review of the record, however, indicates that neither side requested a limiting instruction. Nor did the district court give one — either when it admitted the evidence of Custer's death or in its final jury instructions.

## IV.

Pursuant to the foregoing, we vacate the convictions and sentences of Johnson and Stewart on the Death Count and the conviction and sentence of Johnson on the Distribution Count. We remand for such other and further proceedings as may be appropriate.

*VACATED AND REMANDED*