**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-4617**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

TERRY KENDELL GEORGE, JR.,

Defendant - Appellant.

---

**No. 23-4131**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

TERRY KENDELL GEORGE, JR.,

Defendant - Appellant.

---

Appeals from the United States District Court for the Eastern District of North Carolina, at Greenville.  Richard E. Myers, II, Chief District Judge (4:21-cr-00041-M-1); James C. Dever III, District Judge.  (4:15-cr-00050-D-1)

---

Argued:  January 24, 2024                                 Decided:  March 11, 2024

---

Before NIEMEYER, AGEE, and THACKER, Circuit Judges.

---

Affirmed by published opinion.  Judge Thacker wrote the opinion in which Judge Niemeyer and Judge Agee joined.  Judge Thacker wrote a concurring opinion.

---

**ARGUED:**  Eric Joseph Brignac, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.  Lucy Partain Brown, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:**  G. Alan DuBois, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.  Michael F. Easley, Jr., United States Attorney, David A. Bragdon, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

---

2

THACKER, Circuit Judge:

Terry George ("Appellant") was charged with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924. In the midst of trial, Appellant learned that the Government's key witness had changed his story two weeks before trial, but the Government had failed to disclose that information to Appellant. The jury convicted Appellant. In a post-trial motion to vacate his conviction or order a new trial, Appellant argued that the Government's failure to disclose the change in testimony of its key witness violated *Brady*.[1] The district court disagreed and denied Appellant's motion.

At the time of his felon in possession conviction, Appellant was serving a term of supervised release as a result of a separate criminal conviction. Based on his felon in possession conviction, the district court revoked Appellant's supervised release.

Appellant appeals both the denial of his post-trial motion and the revocation of his term of supervised release. Because we determine that the Government's failure to disclose the changed testimony was not material to Appellant's defense, we affirm the district court in both cases.

---

[1] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution.").

3

I.

A.

The Underlying Offense

Appellant was riding in the front passenger seat of a vehicle that was stopped by police in August 2020. An officer had been pumping gas at a convenience store when the clerk came out to tell him that four black males had stolen drinks and snacks, and that they had left in a white Chevrolet Tahoe. A short while later, officers stopped the vehicle Appellant was riding in because it matched the description of the one involved in the convenience store theft. At the time of the stop, the only occupants were the driver, who was Appellant's cousin Prince Frazier, and Appellant. Frazier gave consent for a search of the vehicle.

Officer Colton Craig conducted the search. He began his search on the front passenger side where Appellant had been seated and "started by grabbing the drink containers that were on the dash." J.A. 204.[2] "As [he] was reaching across the seat to grab them . . . [he] felt something underneath the seat cover." *Id.* at 204. Officer Craig described the item he felt as "a thick cylinder or rectangle object that was strong and hard." *Id.* at 204–05. The seat had a "fairly loose fitting" seat cover over it, and Officer Craig testified that when he lifted the seat cover, he discovered a loaded magazine. The magazine was a "double-stack .45 caliber magazine," which "means that it is thicker and allows for two rounds to be side by side in the magazine." *Id.* at 206–07. Continuing the search, Officer

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Craig "found a Taurus handgun wedged between [the front passenger] seat and the B pillar of the Tahoe." *Id.* at 209–10. There was one round loaded in the chamber of the firearm.

According to Officer Craig, Appellant would have had access to the firearm from his seat, and the gun was positioned such that "the barrel of the firearm point[ed] into the back of the vehicle." J.A. 212. While Officer Craig confirmed "[i]t is possible" there was "space there to drop a gun down in there" from the back seat, he was not sure whether a back seat passenger could have reached the gun in the position in which he found it. *Id.* at 218.

There was no physical evidence tying Appellant to the firearm or magazine except their location in the vehicle, and both Appellant and Frazier denied knowledge or ownership of the firearm. Because Appellant had prior felony convictions, he was arrested for being a felon in possession of a firearm.

B.
Pre-trial Discovery

Appellant was indicted in October 2021 for being a felon in possession of a firearm and ammunition. Appellant requested discovery, including impeaching and exculpatory information, and the Government provided discovery on several occasions. Part of the discovery turned over by the Government included the police report from the August 2020 shoplifting incident, which noted that four men shoplifted from the convenience store and fled in a vehicle matching the Tahoe. The Government also turned over an interview report of a December 2021 interview with Frazier, in which he disclosed that two other people,

Kate (Last Name Unknown) and an unnamed male, had been riding in the back seat prior to the stop, but he had dropped them off after leaving the convenience store.

In March 2022, two weeks before trial, the prosecutor and Agent Crumley, an agent from the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives, interviewed Frazier again in preparation for trial. This time, Frazier provided a different account of who was in the Tahoe prior to the traffic stop. He told the prosecutor and Agent Crumley that the back seat passengers had been Brody George and Chris (Last Name Unknown). Frazier also told them that Brody and Chris were his and Appellant's cousins. Although the Government supplemented its discovery responses to inform Appellant about the pre-trial interview and other information Frazier provided during the interview, the Government did not disclose to Appellant that Frazier had changed his story with regard to the identities of the rear passengers.

## C.
## The Trial

At trial, Frazier was the Government's key witness. Appellant had prepared his trial strategy around the idea that "there will be no reason to believe a . . . single word out of Mr. Frazier's mouth." J.A. 177. His "defense focused on the back seat passengers who had access to the gun and on Mr. Frazier's credibility as the only witness to connect the gun to [Appellant]." Opening Br. at 8.

During Appellant's opening statement, his counsel told the jury that law enforcement had been unable to investigate anyone other than Appellant because "Frazier,

6

to this day, has still provided – has not provided the names of those individuals. He has said 'Kate' and then no fourth name." J.A. 174–75.

On the first day of trial, during Frazier's direct examination as a witness for the Government, he testified that he was Appellant's cousin and a former gang member. He testified that he had prior felony convictions, but none of them involved firearms. He testified that he had seen Appellant with firearms and that Appellant had a reputation for carrying firearms.

Moving on to the night of the traffic stop, Frazier testified that he and Appellant had been with "two of my little cousins," Brody and Chris, and that Brody and Chris had been the back seat passengers in the Tahoe prior to the traffic stop. J.A. 267. Appellant was taken aback by this testimony as it was at odds with Frazier's prior statement that had been disclosed by the Government. It was also at odds with Appellant's trial strategy. Appellant "could only assume that the [G]overnment was as surprised by this changed story as [he] was." Opening Br. at 9.

When discussing the traffic stop, Frazier testified that Appellant became "shaky" and "jumpy" when the blue lights came on. J.A. 277. He further testified that the firearm was not his and that he had not seen it that night. But he said he had seen Appellant possess the firearm "about a couple days" earlier. *Id.* at 282–83. As for the magazine Officer Craig found under the seat cover on Appellant's seat, Frazier testified that he did not put it there, but he did not see anyone else, including Appellant, put it there either.

On cross examination, Appellant's counsel asked Frazier about his earlier statements that the back seat passengers had included a woman named Kate. Frazier responded, "No, I never said that." J.A. 291. The exchange continued:

> Q. So when Mr. Crumley testifies, he's not gonna tell this jury that you told him that it was a woman named Kate?
>
> A. No.
>
> Q. Okay. And when Mr. Crumley testifies later today, he's not gonna tell this jury over here that you didn't give any name for the fourth person in the car?
>
> A. No, because I never mentioned a fourth person.
>
> Q. Okay. Oh, so you just didn't mention a fourth person before at all.
>
> A. Yeah.
>
> Q. Okay. So you just kept that detail to yourself –
>
> A. Right.
>
> Q. -- until now?
>
> A. Right. Like I said, I didn't want to be here.

*Id.* at 292.

According to Appellant, based on this testimony, he still believed this was a change in Frazier's story about which the Government had been just as surprised as he was. Following Frazier's testimony, the Government made no attempt to correct the record or otherwise disclose that this testimony was part of the Government's March trial preparation interview.

8

In addition to questioning Frazier about his prior inconsistent statement as to the rear passengers, Appellant used his cross examination of Frazier to thoroughly impeach Frazier's credibility. For example, Frazier had testified that he was a former gang member but was no longer involved with the gang. On cross examination, Appellant introduced photographs of Frazier with other gang members and making gang signs. Similarly, Frazier had testified that he was not involved with or ever around guns, but Appellant introduced photographs of Frazier with guns. Appellant also highlighted that Frazier told the jury he did not want to testify, but nonetheless he met with the Government several times leading up to trial to provide information. And Appellant pointed out that Frazier was hoping to receive a benefit for testifying, given that Frazier was facing other criminal charges at the time.

After Frazier's testimony, the Government called two separate witnesses to provide similar act testimony pursuant to Federal Rule of Evidence 404(b). Those witnesses each described a separate time when Appellant had been arrested in a vehicle with a firearm under his seat. The Government then rested its case and the court adjourned for the day.

On day two of the trial, Appellant called his sole witness -- Agent Crumley. Appellant's counsel asked him about Frazier's change in story:

> Q. Yesterday Mr. Frazier testified that there was actually a person -- Brody, his cousin, was one of the passengers in the back seat car. Correct?
>
> A. Yes, sir.
>
> Q. Okay. Was that the first time you had heard that?

9

A. I do know that the last time we had the trial prep he did bring up names of the two that were in the back seat, like first names or maybe full names. I can't recall. But he did state the last time we talked to him at the detention center, he said these are the two males in the back seat.

Q. Okay. And so -- but --

A. And one was Brody, I believe.

Q. Okay. Had you heard the name Chris before, the other passenger he testified to yesterday?

A. Yes. That was -- I believe at his grandmother's house he brought that name -- or no, he didn't. He brought Kate. Chris was the one that was at the detention center, I believe.

Q. Okay. All right. And again, [at the detention center] that was the first time you'd heard that information.

A. Yes.

J.A. 369. At the end of Agent Crumley's testimony, Appellant rested.

After the close of evidence, Appellant's counsel addressed the court:

> Your Honor, I'm not asking for any Court action at this point, but I just want to put on the record that Agent Crumley testified that Prince Frazier had previously identified the gentlemen in the back seat of the car as Brody and Chris. The first we learned of that was during his testimony yesterday. That was not previously provided to us . . . . Which is potential impeachment and/or potentially *Brady* material. And again, I'm not asking the Court to do anything at this point, but I did just want to put that on the record.

J.A. 391. Appellant made no further argument or objection and did not mention the issue further during the trial.

During his closing argument, Appellant argued there was a "lack of credible witness[es]," and observed that Frazier's "story is constantly changing." J.A. 444–45.

10

Appellant also reminded the jury of all the ways in which Frazier's credibility had been called into question during the trial. In addition, Appellant impugned the thoroughness of the police investigation by arguing (1) that police did not "follow-up on the -- his assertion, Mr. Frazier's assertion that he doesn't have guns," (2) there was no DNA testing that tied Appellant to the gun, and (3) "there was no pursuit when they learned about a month ago, or whenever it was, I'm unsure still, whenever Mr. Frazier told him who else was in the back seat . . . there was no pursuit to investigate those people." *Id.* at 443.

Even though Appellant faced only a single count indictment for being a felon in possession of a firearm and ammunition, the jury was given a special interrogatory to determine Appellant's guilt on (1) possession of a firearm and (2) possession of ammunition, as both are means of committing the same offense. The jury found Appellant guilty of both means of committing the offense of being a felon in possession in violation of 18 U.S.C. §§ 922(g)(1) and 924.

### D.
### Post-Trial Motions

A few weeks after the guilty verdict, Appellant moved for a mistrial and dismissal with prejudice or for a new trial. Appellant argued that the Government was obligated pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) to disclose any information that may be exculpatory, including prior inconsistent statements that "are possible grounds for impeachment." J.A. 556. Appellant argued the Government violated *Brady* by failing to disclose that Frazier changed his story in the interview that occurred two weeks before trial. Appellant argued "the identity and characteristics of the people in the car immediately prior

11

to the stop . . . was material information." *Id.* at 556–57. He claimed that his trial "argument was that there were previously other persons in the car that could have left the firearm without [Appellant] being aware that it was in the vehicle." *Id.* at 556. "Had the [G]overnment disclosed . . . the fact of [Frazier's] identification of the other passengers in the car . . . counsel for [Appellant] would have conducted further investigation and prepared additional defense arguments." *Id.* at 557. According to Appellant, "[t]he failure of the [G]overnment to disclose previously known information regarding the identification of other passengers in the car just prior to [Appellant's] arrest [wa]s a violation" of *Brady* and the right to due process. *Id.*

Initially, the Government responded that it "believe[d] that the good faith failure to disclose the statement did not affect the result of the proceedings or undermine confidence in the verdict," but it nevertheless "in an abundance of caution and in the interests of justice" consented to Appellant's request for a new trial. J.A. 560.

The district court held a status conference on the matter where it expressed doubt that it could order a new trial based only on the Government's consent. Without a finding of a *Brady* violation, the district court believed that it did not have the authority to grant a new trial. The Government responded, "Well. . . in light of the Court's comments, the Government would be willing to acknowledge a *Brady* violation and ask for a new trial." J.A. 565. The district court then asked the Government to "state what it thinks constitutes the material basis for [the *Brady* violation]." *Id.* The court explained that it was concerned because "[t]he new information that has come out is the identity of the two rear passengers. The defendant was present for the entirety of their time in the back seat, and they are related

12

to him as well as being related to the driver . . . so I'm not sure that this is new material information," such that it could constitute a *Brady* violation. *Id.* at 565–56. The district court also explained, "[t]he witness was cross-examined. I'm not sure how the new trial looks materially different." *Id.* at 567. "[I]n light of the Court's concerns," the Government then asked to hold "in abeyance the Government's position as far as whether a *Brady* violation occurred or not." *Id.*

When the Government filed its new response to Appellant's motion for a new trial, it acknowledged that it *should* have disclosed the pre-trial identification of the rear passengers. But it also argued that there was no *Brady* violation because the evidence not disclosed was not material in that Appellant already possessed the information and Appellant was able to cross examine Frazier and Agent Crumley about the information. In response, Appellant argued that the identification was "clearly favorable" to him and "clearly material" to his defense because "the failure to disclose the witness statement undermines the confidence in the verdict as it deprived [Appellant] the opportunity to fully investigate other persons potentially responsible for the firearm located in the car." J.A. 586.

The district court ultimately denied Appellant's motion for a new trial. The court explained, "There are two issues at stake here—the content of the statement and the fact that the statement was inconsistent with a prior statement." J.A. 594.

As to the content, the court held that the identities were not "material" because Appellant "knew the identities of the two passengers." J.A. 594–95. And the court believed "[t]he unrebutted testimony established that both Brod[y] George and Christopher

13

are [Appellant's] family members and they were together for several hours in the same car prior to the traffic stop." *Id.* at 595. And given that "Agent Crumley testified that submitting anyone's fingerprints, including Prince Frazier, Brodie George, or Chris, would come up negative because there were no fingerprints on the gun," the court did not find the identifications to be material. *Id.*

As to the fact that the statement was inconsistent, the district court held that "the [G]overnment disclosed Frazier's inconsistent statement . . . in time for [Appellant] to cross-examine Frazier and examine Agent Crumley, curing any prejudice allegedly caused by the late disclosure." J.A. 595. Thus, the court concluded that "the late disclosure of evidence is not material when [Appellant] was able to engage with the substance of the information on cross-examination." *Id.* Because Appellant impeached Frazier with the inconsistent statement and in numerous other ways, had an overnight recess to consider the information, and successfully used the information in closing argument, the court did not find any *Brady* error.

Finally, the court concluded that the jury had sufficient evidence to convict Appellant even without Frazier's testimony because the evidence demonstrated that Appellant had been sitting on the magazine, the gun was beside him, and he had a history of illegally possessing firearms "in strikingly similar factual postures." J.A. 599. For all of those reasons, the district court denied Appellant's motion for a new trial. Appellant was sentenced to 33 months of imprisonment. He timely noted an appeal.

14

E.

The Supervised Release Revocation

At the time of the firearm offense discussed above, Appellant was serving an unrelated term of supervised release in the Eastern District of North Carolina for a 2016 conviction, also for being a felon in possession of a firearm. Appellant's Probation Officer moved to revoke his supervised release in that case based on the criminal conduct described above in this case. The district court held a revocation hearing in which it took judicial notice of the 2022 jury verdict and found that Appellant had violated his supervised release. As a result, the district court revoked Appellant's supervised release and sentenced him to 24 months of imprisonment to run consecutive to the 33 months imposed as a result of the 2022 conviction.

Appellant timely appealed that decision, and we consolidated the appeals.

II.

We review the district court's denial of a motion for a new trial for abuse of discretion.[3] *United States v. Wolf*, 860 F.3d 175, 189 (4th Cir. 2017). "It is an abuse of

---

[3] The Government argues that the specific argument Appellant raises on appeal -- that the Government violated *Brady* when it withheld the *fact* that Frazier made an inconsistent statement -- was not preserved below so we should review only for plain error. Rather, the Government claims that Appellant only argued in the district court that the withholding of the *identifications* of the rear passengers violated *Brady*. The requirement that litigants preserve assignments of error "serves to induce the timely raising of claims and objections, which gives the district court the opportunity to consider and resolve them." *Puckett v. United States*, 556 U.S. 129, 134 (2009).

The district court below clearly understood Appellant's position to take issue with both the fact of the inconsistent statement *and* the identifications. Indeed, its order plainly explained, "There are two issues at stake here—the content of the statement and *the fact that the statement was inconsistent with a prior statement*." J.A. 594 (emphasis supplied). (Continued)

15

discretion for the district court to commit a legal error—such as improperly determining whether there was a Brady violation—and that underlying legal determination is reviewed de novo." *United States v. Wilson*, 624 F.3d 640, 660–61 n.24 (4th Cir. 2010).

We review a "district court's factual findings underlying a revocation of supervised release for clear error and its ultimate decision to revoke a defendant's supervised release for abuse of discretion." *United States v. Cohen*, 63 F.4th 250, 253 (4th Cir. 2023) (cleaned up).

## III.

## A.

Here, we must decide whether the district court correctly determined that the Government's failure to disclose Frazier's inconsistent statement did not amount to a *Brady* violation.

The Supreme Court's decision in *Brady* establishes that the prosecution's "suppression . . . of evidence favorable to an accused" violates due process. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). "To demonstrate a *Brady* violation, 'the proponent must show that the undisclosed evidence was (1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, i.e., prejudice must have ensued; and (3) that the prosecution had materials and failed to disclose them.'" *United States v. Taylor*, 942 F.3d 205, 225 (4th Cir. 2019) (citing *United States v. Wolf*,

---

Because the district court understood Appellant to have made this argument below, and in fact ruled on the argument, we decline to review the issue only for plain error.

860 F.3d 175, 189–90 (4th Cir. 2017) (cleaned up); *Giglio v. United States*, 405 U.S. 150, 153–54 (1972) [4].

There is no dispute that the fact that Frazier made an inconsistent statement is favorable to Appellant because it is impeaching. Similarly, there is no dispute that the prosecution knew about the inconsistent statement.

1.

The Government argues on appeal that the inconsistent statement was not actually withheld because Appellant learned about it through his direct examination of Agent Crumley. We disagree.

Following the March trial preparation interview with Frazier, the Government supplemented its pre-trial discovery responses to provide Appellant with *some* information about the very interview where Frazier changed his story. But it did not include *all* of the relevant information from that interview. The Government's supplemental discovery response specifically did *not* include the critical change in Frazier's story. By failing to disclose this information, the Government improperly withheld impeachment evidence. *See Taylor*, 942 F.3d at 225; *see also Giglio*, 405 U.S. at 153–54. And, upon hearing Frazier testify during trial that he had not previously named Brody and Chris as the rear passengers, the Government made no effort to correct the record or disclose that Frazier had made the inconsistent statement just weeks earlier. *See United States v. Kelly*, 35 F.3d 929, 933 (4th Cir. 1994) (explaining that a *Brady* violation can occur "whether the

---

[4] *Giglio* applied *Brady* to impeachment evidence.

government solicited testimony it knew or should have known to be false or simply allowed such testimony to pass uncorrected"). The record of the Government's conduct makes clear that it did not disclose the inconsistent statement to Appellant. Instead, Appellant was ambushed when his own counsel questioned Frazier on cross examination and then Agent Crumley on direct examination. In our view, the Government was not relieved of its duty to have disclosed its pre-trial knowledge of the inconsistent statement just because Appellant later happened to stumble upon it during trial. Thus, we are left to determine only whether the fact of the inconsistent statement was material to the defense.

## 2.

"[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." *Kyles v. Whitley*, 514 U.S. 419, 436–37 (1995). "Rather, the suppressed evidence must be materially favorable to the accused — that is, the nondisclosure must be 'so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.'" *United States v. Blankenship*, 19 F.4th 685, 692 (4th Cir. 2021) (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)). "Stated otherwise, the question is whether 'the favorable evidence,' 'considered collectively,' 'could reasonably be taken to put the whole case in such a different light as *to undermine confidence in the verdict*.'" *Blankenship*, 19 F.4th at 692 (emphasis in original) (quoting *Kyles*, 514 U.S. at 435–36).

We have previously held that where "the question of guilt or innocence essentially involved a credibility determination between" the defendant and a witness, "evidence that seriously undermined [the witness's] credibility must be considered material." *United*

18

*States v. Kelly*, 35 F.3d 929, 937 (4th Cir. 1994). At the same time, however, where the withheld evidence is impeaching but the witness was impeached in other ways at trial, we have held that the withheld evidence was not material. *See, e.g.*, *United States v. Hoyte*, 51 F.3d 1239, 1243 (4th Cir. 1995) (agreeing with the trial court that undisclosed statements "would not have changed the trial's outcome because [the witness] was impeached in so many other ways"); *United States v. Chavez*, 894 F.3d 593, 600 (4th Cir. 2018) (concluding that withheld evidence was not material in part because "the defense had the opportunity to impeach [the witness's] testimony repeatedly throughout the trial").

In *United States v. Taylor*, for example, the defendants argued that later discovered information that one of the Government witnesses was under investigation for drug offenses at the time of their trial was material. While we agreed that the evidence might have been impeaching, we found it hard to imagine "how information that [the witness] was under investigation for drug offenses would have been consequential to his credibility in the jury's eyes given that the defense had impeached him with evidence of his two prior firearms convictions" and the jury had heard evidence of his prior drug conviction. *Taylor*, 942 F.3d at 226. We held, "[e]vidence of the investigation would have been only cumulative — and then only slightly so." *Id.* Similarly, there is no due process violation when the defendant is able to make "effective use" of the withheld *Brady* information at trial. *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir. 1985).

3.

We hold that the fact of the inconsistent statement was not material to Appellant's defense.

19

Appellant's arguments that the fact of the inconsistent statement was material to his defense largely relate to his belief that his counsel lost credibility with the jury because counsel "told the jury that it would be hearing about someone named Kate – which is the story that they thought Mr. Frazier would be telling." Opening Br. at 27. Appellant argues that because his attorneys lost credibility, he did too. And he argues that this loss of credibility wrought by the Government's failure to disclose undermines confidence in the verdict. This argument is unavailing. The jury did hear about Kate. During cross examination, Appellant asked Frazier if he had previously told police about Kate, and Frazier responded that he "never said that." J.A. 291. Appellant asked if Agent Crumley would confirm that, and Frazier indicated he would. But when Appellant examined Agent Crumley, Agent Crumley confirmed that Frazier had previously said "Kate" was in the back seat. This testimony bolstered Appellant's opening statement and also impeached Frazier.

Indeed, in addition to impeaching Frazier with the inconsistent statement itself, Appellant impeached Frazier's credibility in a number of other ways during the trial. For example, as detailed above, he impeached Frazier's testimony that he was no longer involved in a gang and that he was never involved with or around firearms. And Frazier's hope of leniency in other criminal cases in exchange for his testimony against Appellant gave the jury further reason to doubt Frazier's credibility. Thus, Appellant's statement to the jury that "there will be no reason to believe a simple – single word out of Mr. Frazier's mouth" was not undermined in any way. J.A. 177. On these facts, we fail to see how the failure to disclose the inconsistent statement undermines confidence in the verdict.

20

Moreover, while Appellant did not have the opportunity to cross examine Frazier about the timing of the statement, the jury was aware that Frazier had told the story about Kate up until the final interview two weeks before trial. And, in his closing argument, Appellant was able to cast doubt upon the law enforcement investigation more than he would have been able to otherwise because he was able to argue that there was "no pursuit when they learned about a month ago, or whenever it was, I'm unsure still, whenever Mr. Frazier told him who else was in the back seat . . . there was no pursuit to investigate those people." J.A. 443. Because the jury knew about the inconsistent statement and Frazier was impeached by it, we find it difficult to imagine how an earlier disclosure would have materially altered the course of the trial.[5]

4.

More fundamentally, however, the fact of the inconsistent statement was not material to Appellant's defense because Appellant's conviction would stand independently of any question about Frazier's credibility because the jury found Appellant guilty of

---

[5] At oral argument, Appellant argued that he had called Agent Crumley as his sole witness because he thought it would serve the purpose of his trial strategy based on his understanding of Frazier's prior statements. But Appellant also argued during oral argument that if he had known about the second statement prior to trial, he might not have called Agent Crumley as a witness at all. In Appellant's view, calling Agent Crumley hurt his case because it allowed the Government to elicit testimony that the jury otherwise would not have heard, such as Agent Crumley's testimony regarding Appellant's reluctance to take a DNA test. *See* Oral Argument at 30:27–31:30, *United States v. George*, No. 22-4617 (4th Cir. Jan. 24, 2024), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments. But this argument appears to be an afterthought because it was not raised before the district court either during the trial or in the post-trial motion, when one might have thought it would have been top of mind. And because the argument was not raised in Appellant's briefing before this court, it is waived.

possessing the firearm *and* possessing the ammunition. While Frazier's testimony was relevant to the firearm possession -- Frazier was the only witness who could connect Appellant to the firearm through his testimony that he had seen Appellant possess it just days before the stop -- it was not relevant to the ammunition possession. Rather, the evidence relevant to the ammunition was that Appellant was actually *sitting on* the loaded magazine, thereby knowingly possessing it. Officer Craig testified that when he rested his hand on the seat to search the car, he felt the magazine under the thin seat cover because it was "a thick cylinder or rectangle object that was strong and hard." J.A. 204–05. On those facts alone, the jury was able to reasonably conclude that Appellant knew he was sitting on the magazine and thereby possessed it. Frazier's testimony that he did not see Appellant or anyone else put the magazine under the seat cover was not material to Appellant's conviction. Because the jury determined, through separate interrogatories, that Appellant was guilty of a single count of felon in possession by possessing *both* the firearm and the ammunition, the failure to disclose the inconsistent statement does not undermine the verdict.

## B.

Finally, because we affirm the district court's *Brady* determination, we also affirm the district court's revocation of Appellant's term of supervised release. The parties do not dispute that the factual basis for the revocation of supervised release was Appellant's felon in possession conviction. Nor do the parties dispute that the revocation is valid if the conviction is valid. Therefore, we affirm the revocation of Appellant's supervised release.

22

IV.

For all of the foregoing reasons, the decisions of the district court are

*AFFIRMED*.

THACKER, Circuit Judge, concurring:

Despite our conclusion that there was no *Brady* error in this case, I am compelled to write separately to address the concerning conduct of the United States Attorney's Office for the Eastern District of North Carolina. The Government readily concedes that it should have disclosed the fact that Frazier changed his story when it supplemented its discovery before trial, and it has acknowledged that it "fell short of [its] own standards in this case." Oral Argument at 17:57–18:00, *United States v. George*, No. 22-4617 (4th Cir. Jan. 24, 2024), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments (hereinafter "Oral Argument"). But the problem goes beyond offending the Government's "own" standards. While *Brady* provides a remedy for discovery abuses that prejudice defendants, discovery abuses that do not ultimately prove "material" oft go unrebuked. Though "[w]e may find such practices 'harmless' as to a specific defendant's verdict, . . . as to litigants in the Eastern District of North Carolina and our justice system at large, they are anything but harmless." *United States v. Bartko*, 728 F.3d 327, 342 (4th Cir. 2013). Even where discovery abuses are "harmless" in a technical sense, they nonetheless "violate constitutional guarantees" and erode public trust in the justice system. *Id.*

I find it particularly troubling in this case that the Government supplemented its discovery to include some information about its final pre-trial interview with Frazier but did not disclose the critical information that he changed his story about the rear passengers. As the Government readily admitted at argument, "that decision was wrong . . . there was an error in judgment there, and we should have turned over the inconsistency." Oral Argument at 20:08–23. It is also troubling that the Government heard Frazier testify on

24

cross examination at trial that he had never identified the fourth person in the vehicle prior to his trial testimony. The Government knew that was not true and yet stood silent and did not correct the record.

And it is worth noting that this court has previously questioned this particular United States Attorney's Office's commitment to constitutional and unabusive discovery practices. *See Bartko*, 728 F.3d at 341–42 (discussing three separate cases and explaining that the United States Attorney's Office for the Eastern District of North Carolina "appears to be betting on the probability that reams of condemning evidence will shield defendants' convictions on appeal such that at the trial stage, it can permissibly withhold discoverable materials and ignore false testimony"). To be sure, *Bartko* was ten years ago. Nonetheless, the similarities here are striking. What is more, on the same day we heard oral argument in this case, a separate panel of this court heard argument in another case which also involved misrepresentations and delayed disclosures by the United States Attorney's Office for the Eastern District of North Carolina. *See United States v. Dashawn Garrett*, 22-4407. In that case, too, the Government admitted it "fell short of the standards we set for ourselves." Oral Argument at 18:05–18:08, *United States v. Garrett*, No. 22-4407 (4th Cir. Jan. 24, 2024), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments.

Suffice it to say, I am concerned about the Government's discovery practices in the Eastern District of North Carolina. Given the confluence of cases in which the Eastern District of North Carolina United States Attorney's Office has breached its discovery standards, it appears a re-evaluation is in order.

25