**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 23-4572**

───────────────

UNITED STATES OF AMERICA,

　　　　　　　Plaintiff – Appellee,

　　v.

MARK BOLLING,

　　　　　　　Defendant – Appellant.

───────────────

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston.  David A. Faber, Senior District Judge.  (2:21-cr-00087-1)

───────────────

Argued:  September 27, 2024　　　　　　　　Decided:  June 16, 2025

───────────────

Before DIAZ, Chief Judge, and HEYTENS and BENJAMIN, Circuit Judges.

───────────────

Affirmed by unpublished opinion.  Judge Benjamin wrote the opinion, in which Chief Judge Diaz and Judge Heytens joined.

───────────────

**ARGUED:**  Brian David Yost, HOLROYD & YOST, Charleston, West Virginia, for Appellant.  Jennifer Rada Herrald, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.  **ON BRIEF:**  William S. Thompson, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

───────────────

Unpublished opinions are not binding precedent in this circuit.

DEANDREA GIST BENJAMIN, Circuit Judge:

Mark Alan Bolling was convicted of various charges related to the possession of drugs, guns, and ammunition. Before trial, Bolling filed several motions, including a motion for a *Franks* hearing, multiple motions to suppress, and multiple motions to dismiss counts of the indictment. At trial, Bolling moved to strike a juror for cause, and after trial, Bolling filed a motion for judgment of acquittal. Bolling challenges the district court's denial of each of these motions. For the reasons below, we affirm.

I.

On September 14, 2020, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) began investigating Bolling after identifying him as a convicted felon who was both distributing heroin and methamphetamine and in possession of firearms. Throughout the investigation, the ATF conducted interviews with a confidential informant, pulled tax records, requested a mail watch on Bolling's residence, installed a pole camera overlooking Bolling's residence, and conducted a controlled buy through the confidential informant.

On September 19, 2020, police officers with the Fayetteville Police Department stopped Bolling on Route 19 in the city of Fayetteville in Fayette County, West Virginia for speeding. This stop was coincidental and unrelated to the ATF investigation. During the stop, officers searched the car and recovered approximately 100 grams of methamphetamine, 30 grams of heroin (which was later identified as fentanyl), ammunition, and over $7,000 in cash. Officers also seized a cell phone from Bolling which

2

they transferred to the ATF on September 23, 2020. Bolling was arrested at the scene, and his cell phone and residence were later searched pursuant to warrants.

Bolling was ultimately charged with: (1) distribution of methamphetamine in violation of 21 U.S.C. § 841(a)(1); (2) possession with intent to distribute fentanyl in violation of 21 U.S.C. § 841(a)(1); (3) possession with intent to distribute 50 grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1); (4) felon in possession of ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); (5) felon in possession of multiple firearms and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and (6) knowingly possessing a firearm, as defined by 26 U.S.C. § 5845(a)(7) and 18 U.S.C. § 921(a)(25), specifically a firearm silencer and a firearm muffler, in violation of 26 U.S.C. §§ 5861(d) and 5871. Following a jury trial, Bolling was convicted of Counts Two through Six.

## II.

We begin with Bolling's motions to suppress. "When reviewing a district court's ruling on a motion to suppress, 'we review factual findings for clear error and legal determinations de novo' " and " 'construe the evidence in the light most favorable to the prevailing party.' " *United States v. Lull*, 824 F.3d 109, 114–15 (4th Cir. 2016) (quoting *United States v. Lewis*, 606 F.3d 193, 197 (4th Cir. 2010)).

## A.

The parties dispute whether the police officer who stopped Bolling, Patrolman T.L. Farley, had reasonable suspicion to prolong the stop. Bolling concedes that he was

3

properly stopped for speeding but argues that Farley violated his Fourth Amendment rights by delaying the "normal activities" involved in a traffic stop—namely, running his license—and by extending the stop without reasonable suspicion to perform a dog sniff. Appellant's Br. at 33, 36, 39.  The Government responds that the district court correctly found that the purpose of the initial stop and its permissible associated safety checks (i.e., requesting Bolling's driver's license, vehicle registration, proof of insurance, and checking for outstanding warrants) were not completed prior to the search because Bolling had not demonstrated that he could lawfully drive the car.  Appellee's Br. at 28–29 (citing *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)).  The Government contends that while this failure alone justified extending the stop, Farley also had reasonable suspicion, further permitting the extension. *Id.* at 29–30.  For the reasons explained below, we need not address whether Farley had reasonable suspicion to extend the stop, as the evidence in the car would have been seized under the inevitable discovery doctrine.

Farley observed Bolling driving 68 miles per hour in a 55 mile per hour zone and initiated a stop for speeding at approximately 2:48 a.m.  When he approached the vehicle, Farley requested Bolling's license, insurance, and registration.  J.A. 261:21–23, 262:3–12, 265:13–16.[1]  Bolling only provided a learner's permit and refused to provide the registration or proof of insurance, stating that the information was "in the car" and he would "have to look for it" but "[didn't] want to do that out [t]here at 3:00 in the morning in the

---

[1] Citations to "J.A." refer to the joint appendix—the record of proceedings at the district court—filed by the parties.

dark." J.A. 340:10–14.[2]  Upon approaching the vehicle, Farley noticed that the cover of the steering wheel was missing, and the airbag appeared to have been deployed and cut, leaving a hole in the steering wheel.  After making this observation and noting Bolling's refusal to provide registration or insurance information, Farley asked Bolling to exit the vehicle, and Bolling complied.

Bolling was unable to explain the hole in his steering wheel or provide additional information about the vehicle, which he claimed was a rental.  Bolling did, however, explain that he was driving from Hico, West Virginia, to Charleston, West Virginia.  Based on Bolling's location when Farley stopped him, Farley observed that Bolling had chosen to take a longer, more circuitous route than necessary.  He noted this route as suspicious. Bolling also avoided eye contact and spoke with a "crackly" voice, which Farley interpreted to mean Bolling was nervous.

At 2:54 a.m., Farley ran the vehicle's information and confirmed that the vehicle was a rental.  J.A. 353–54.  At 2:59 a.m., Farley ran the information for the backseat passenger, Samuel Burdette, and determined that Burdette had an expired license, but no active warrants.  J.A. 354.  Shortly thereafter, at 3:12 a.m., based on his suspicions that

---

[2] There was conflicting testimony below about when Bolling produced his license during the stop.  Farley initially testified that Bolling was unable to provide any of the requested information when asked.  J.A. 266:5–13.  Farley later confirmed that Bolling's license information was run through the system at 4:07 a.m., meaning that he received the license during the encounter, but he did not remember receiving Bolling's license.  J.A. 298:11–23.  Bolling, on the other hand, testified that he provided his license at the beginning of the stop.  J.A. 340:10–14.  The district court credited Farley's testimony that Bolling was unable to provide a driver's license.  J.A. 886, 890, 901.

arose during his conversation with Bolling, his observation of the hole in the steering wheel, and Bolling's inability to provide proof of insurance, Farley requested a K-9 unit. J.A. 276:11–19, 289:1–12. Dispatch informed Farley that they were "having trouble contacting the canine handler" at that time. J.A. 283:3–5. Farley then continued his roadside conversation with Bolling while waiting for the K-9. Throughout this conversation, Farley "knew in the back of [his] mind that [he] was going to tow th[e] vehicle" based on Bolling's failure to provide insurance, but he did not immediately call for a tow truck. J.A. 286:13–16, 291:9–18.

Eventually, Farley initiated the tow by asking the passengers to exit the car. J.A. 292:10–23. Farley first asked the front-seat passenger, Christopher Smith, to exit the vehicle. J.A. 292:21–23. When Smith exited the vehicle, Farley observed a "clear plastic bag with suspected marijuana in it." J.A. 292:25–293:1. Farley next asked Burdette to exit the vehicle. J.A. 293:4–5. Farley ran Bolling's learner's permit through dispatch at 4:07 a.m., and Smith's license was run through dispatch at 4:14 a.m. J.A. 354–55.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Although violations of the Fourth Amendment often require the suppression of any resulting evidence, there are exceptions. *See Herring v. United States*, 555 U.S. 135, 140 (2009). "One such exception is the inevitable discovery doctrine, which allows the government to use evidence gathered in an otherwise unreasonable search if it can prove by a preponderance of the evidence 'that law enforcement would have "ultimately or inevitably" discovered the evidence by "lawful means." ' " *United States v.*

6

*Seay*, 944 F.3d 220, 223 (4th Cir. 2019) (quoting *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017)).  The government must show "first, that police legally *could* have uncovered the evidence; and second, that police *would* have done so."  *United States v. Alston*, 941 F.3d 132, 138 (4th Cir. 2019) (quoting *United States v. Allen*, 159 F.3d 832, 840 (4th Cir. 1998)).  Whether law enforcement would have inevitably discovered the disputed evidence through lawful means is a question of fact, "and we thus accord great deference to the district court's findings."  *Bullette*, 854 F.3d at 265.

" 'Lawful means' include an inevitable search falling within an exception to the warrant requirement . . . that would have inevitably uncovered the evidence in question."  *Id.* (quoting *Allen*, 159 F.3d at 841).  The automobile exception to the warrant requirement "allows police to search a vehicle if they have probable cause to believe it contains contraband."  *Alston*, 941 F.3d at 138 (citing *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (per curiam)).

Farley testified, and his supervisor, Patrolman Tyler McMillion, confirmed, that the department's policy was to tow a vehicle when its driver is unable to provide proof of insurance.  The district court properly credited Farley and McMillion's testimony that their practice was to have a vehicle towed if the driver failed to provide proof of insurance.[3]

---

[3] The West Virginia statute cited by the parties, W. Va. Code Ann. § 17D-4-2, is silent about whether a car should be towed.  Nonetheless, "[w]e particularly defer to a district court's credibility determinations[,]" and this court has previously affirmed a district court's decision to credit an officer's testimony about the need to tow a car for a particular traffic violation.  *See United States v. Perez*, 30 F.4th 369, 377 (4th Cir. 2022).

Based on the finding that Farley could have—and would have—legally towed the car, the evidence in the car would have inevitably been discovered. The department's "tow policy" meant Farley would have had to ask the passengers to exit the car at some point. Once the front passenger exited the car, the marijuana in plain view allowed Farley to search the car through lawful means—the automobile exception to the warrant requirement. *See Alston*, 941 F.3d at 138 ("An officer's detection of marijuana creates . . . probable cause." (citing *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016))); *see also United States v. Runner*, 43 F.4th 417, 422–23 (4th Cir. 2022) (considering probable cause related to drug paraphernalia in plain view) (collecting cases). Stated simply, because Farley was able to search the car based on the automobile exception, the marijuana and the other evidence seized from the vehicle would inevitably have been discovered, so the inevitable discovery doctrine applies. We therefore affirm the district court's denial of Bolling's motion to suppress the evidence recovered from the car.

## B.

The parties also dispute the lawfulness of the search of Bolling's phone 17 months after the phone was recovered. Bolling argues that the 17-month delay was unreasonable and that the ATF falsely alleged that updated technology enabling the search of the phone was not available until December 2021. The Government, on the other hand, argues that law enforcement's interest in keeping Bolling's phone until the development of new technology outweighed any possessory interest Bolling had in the phone while incarcerated.

The ATF received Bolling's phone on September 23, 2020, and applied for a warrant to search it on September 30, 2020. Although a search warrant was issued the same day, officers could not unlock the phone because the available technology at the time was not compatible with Bolling's phone. Law enforcement received "specialized tools," which allowed agents to unlock and search the phone, around December 2021. On February 10, 2022, the ATF applied for and obtained a second search warrant to search the phone. Agents were able to unlock the phone the same day.

"A seizure that is 'lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests.' " *United States v. Pratt*, 915 F.3d 266, 271 (4th Cir. 2019) (quoting *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)). When considering the constitutionality of an extended seizure, we must evaluate the reasonableness of the conduct. *Id.* "Reasonableness" is determined by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Jacobsen*, 466 U.S. at 125 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). "A strong government interest [in personal property] can justify an extended seizure." *Pratt*, 915 F.3d at 271–72 (collecting cases). Although an arrestee "has diminished privacy interests" and diminished possessory interests compared to someone who is not in custody, this "does not mean that the Fourth Amendment falls out of the picture entirely." *Riley v. California*, 573 U.S. 373, 392 (2014). An individual's interests may also be diminished "if he consents to the seizure or voluntarily shares the seized object's contents." *Pratt*, 915 F.3d at 272.

9

Bolling's arguments again fail.  As detailed above, Bolling's phone was seized pursuant to a lawful traffic stop.  Although Bolling did not consent to the search of the phone or voluntarily share its contents, he was in custody while the Government maintained possession of his phone.  Bolling's possessory interests during that time were therefore diminished. *See Riley*, 573 U.S. at 392.  Further, there is no evidence in the record that Bolling himself requested the return of his phone while he was in custody, nor that he requested its return through his wife or attorney.  The Government, suspecting that the phone contained incriminating evidence related to drug and gun violations, had a strong interest in extending the seizure of the phone. *See Pratt*, 915 F.3d at 271–72.  That interest was further strengthened by a recorded jail call between Bolling and his wife during which he asked her to wipe the contents of the phone.  Balancing these interests, the weight of these circumstances leans in favor of the Government.  Thus, we find no error in the district court's denial of Bolling's motion to suppress the evidence recovered from the phone.

### III.

Following his trial, Bolling filed a motion for judgment of acquittal, or, alternatively, motion for a new trial, arguing that the Government failed to provide sufficient evidence to support any of the charges for which he was convicted.  At issue on appeal is whether the Government presented sufficient evidence to support the firearms charges in Counts Five and Six.

We review a district court's denial of a Rule 29 motion for judgment of acquittal de novo. *United States v. Smith*, 54 F.4th 755, 766 (4th Cir. 2022).  Our review of the

10

sufficiency of the evidence asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Perry*, 92 F.4th 500, 514 (4th Cir. 2024) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A defendant challenging the sufficiency of the evidence "must overcome a heavy burden." *United States v. Haas*, 986 F.3d 467, 477 (4th Cir. 2021) (quoting *United States v. Wolf*, 860 F.3d 175, 194 (4th Cir. 2017)).

A district court should grant a new trial under Rule 33 "when the evidence weighs so heavily against the verdict that it would be unjust to enter judgment." *United States v. Rafiekian* (*Rafiekian II*), 68 F.4th 177, 186 (4th Cir. 2023) (alteration accepted) (quoting *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985)). "We review a district court's grant of a new trial for abuse of discretion. Under this standard, we do not substitute our judgment for the district court's; we simply ask whether that court exercised its discretion in an arbitrary or capricious manner." *Id.* (first citing *United States v. Rafiekian* (*Rafiekian I*), 991 F.3d 529, 549 (4th Cir. 2021); and then citing *United States v. Fulcher*, 250 F.3d 244, 249 (4th Cir. 2001)).

### A.

Counts Five and Six charge Bolling with being a felon in possession of multiple firearms and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and knowingly possessing an unregistered firearm silencer and muffler in violation of 26 U.S.C. §§ 5861(d) and 5871. Bolling argues that the Government failed to prove beyond

a reasonable doubt that he actually or constructively possessed the firearms recovered during the search of the apartment building.

18 U.S.C. § 922(g)(1) "does not require proof of actual or exclusive possession; constructive or joint possession is sufficient." *United States v. Lawing*, 703 F.3d 229, 240 (4th Cir. 2012) (quoting *United States v. Gallimore*, 247 F.3d 134, 136–37 (4th Cir. 2001)). To establish constructive possession, the prosecution must show that Bolling "intentionally exercised dominion and control over the firearm, or had the power and intention to exercise dominion and control over the firearm." *United States v. Davis*, 75 F.4th 428, 437 (4th Cir. 2023) (quoting *United States v. Scott*, 424 F.3d 431, 435 (4th Cir. 2005)). The prosecution may prove constructive possession "by way of either direct or circumstantial evidence." *Id.* (citing *United States v. Laughman*, 618 F.2d 1067, 1077 (4th Cir. 1980)).

On September 21, 2020, the ATF executed a search warrant at 117 Keystone Drive. The Government presented testimony from Special Agent David J. Bullard that the ATF recovered two firearms—a Rock River Arms LAR, found in a black case, and a Bryco Arms pistol—and a silencer from Apartment 3 in the building. At the time, Donald Jordan was renting the apartment.

The Government also presented testimony from Jordan that Bolling's wife, Teresa Bolling, was his landlord, and that he believed she had access to his apartment. Jordan further testified that he did not know that the recovered guns were in his apartment, that the guns were not his, and that he was not a "gun guy." J.A. 720:18–25, 721:1–10. The Government presented photos from Bolling's phone, including a screenshot of a Google search for "rock river arms lar-15 price." J.A. 756. Other photos from Bolling's phone

12

showed handguns and rifles, including one with a silencer, in a background that matched the appearance of Bolling's apartment. J.A. 757–58. The guns in these photos were consistent with the guns recovered from Jordan's apartment. *See* J.A. 753–55, 757–58, 764–65, 767. Finally, the jury heard a recorded jail call in which Bolling asked his wife to move his "tools" and a black case out of his apartment two days before officers searched the building. J.A. 805.

Taken together and viewing this evidence in favor of the prosecution, this evidence is sufficient to demonstrate that Bolling had constructive possession over the firearms he was charged with possessing in the second superseding indictment. *See Perry*, 92 F.4th at 514 (quoting *Jackson*, 443 U.S. at 319). Accordingly, we affirm the district court's denials of Bolling's motions for judgment of acquittal and a new trial.

IV.

A.

Bolling also disputes the district court's denial of his motion for a *Franks* hearing and motion requesting additional discovery based on alleged *Brady* violations and due process violations. Bolling argues that the affidavits submitted in support of the warrants to search the 117 Keystone Drive property and his cell phone contained false statements, rendering them insufficient to establish probable cause and therefore void under *Franks v. Delaware*, 438 U.S. 154 (1978). Bolling also contends that law enforcement violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to turn over the following evidence: (1) pole camera surveillance footage of Bolling's home; (2) the

13

neighbor's security DVR; (3) the "black case" referred to in a jail phone call (which prevented Bolling from comparing a gun case to a pipe bender case); and (4) the pre-search video of 117 Keystone Drive.  Bolling argues that the lost video footage would have shown that there was only one way to enter Jordan's apartment and could have been used to refute the statements in the affidavits that the property was a single-family dwelling.

The Government argues that there was no evidence of bad faith.  They note that the evidence it possessed was provided prior to pretrial motions and the trial and therefore was not suppressed.  The Government further contends that Bolling cannot demonstrate that the lost video evidence and the black case had any exculpatory value, because photos of the black case, which were in evidence, would have allowed Bolling to make the comparison between a gun case and a pipe bender case.

## B.

We review the denial of a *Franks* hearing de novo, and "we review the court's factual findings relating to such rulings for clear error." *United States v. Allen*, 631 F.3d 164, 171 (4th Cir. 2011).

*Franks* entitles a defendant to suppression of seized evidence if, during an evidentiary hearing to determine the veracity of statements in a search warrant affidavit, "perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause." *United States v. Pulley*, 987 F.3d 370, 376 (4th Cir. 2021) (quoting *Franks*, 438 U.S. at 156).  A defendant may also challenge an affidavit under *Franks* "when the affiant has omitted material facts from the affidavit." *Id.*

14

(citing *United States v. Wharton*, 840 F.3d 163, 168 (4th Cir. 2016)).  "To establish a *Franks* violation, a defendant must prove that the affiant either intentionally or recklessly made a materially false statement or that the affiant intentionally or recklessly omitted material information from the affidavit."  *Id.*  "Allegations of negligence or innocent mistake are insufficient."  *Id.* at 377 (quoting *Franks*, 438 U.S. at 171).

The Government "has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt[.]"  *United States v. Johnson*, 996 F.3d 200, 206 (4th Cir. 2021) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).  A failure to do so is a violation of a defendant's right to due process.  *Id.*  Such a violation is governed by *Brady v. Maryland*, 373 U.S. 83 (1963).  To prove a *Brady* violation, a defendant must show that the evidence at issue was "(1) favorable to the defendant (either because it was exculpatory or impeaching), (2) material to the defense (that is, prejudice must have ensued), and (3) suppressed (that is, within the prosecution's possession but not disclosed to the defendant)."  *United States v. Young*, 916 F.3d 368, 383 (4th Cir. 2019) (citing *United States v. Sarihifard*, 155 F.3d 301, 309 (4th Cir. 1998)); *see United States v. George*, 95 F.4th 200, 209 (4th Cir. 2024) (collecting cases).  "Favorable evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' "  *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

A due process violation may also arise out of the prosecution's failure to preserve evidence "if the evidence 'possesses an exculpatory value that was apparent before the

15

evidence was destroyed' and if it is 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.' " *Johnson*, 996 F.3d at 206 (alteration accepted) (quoting *Trombetta*, 467 U.S. at 489). "A showing of bad faith is required, however, when the lost evidence can only be said to be 'potentially useful' to the defendant because the contents of the evidence are unknown." *Id.* (citing *Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988)). If a defendant "can only speculate as to what the requested information might reveal, he cannot satisfy *Brady*'s requirement of showing that the requested evidence would be favorable to the accused." *Caro*, 597 F.3d at 619 (cleaned up) (quoting *Brady*, 373 U.S. at 87).

During the investigation, there were primarily issues with three pieces of evidence: (1) the pole camera installed outside of Bolling's house failed to record footage, *see* J.A. 565:12–16, 771; (2) agents were unable to extract data from a neighbor's DVR footage of Bolling's house, *see* J.A. 444:18–22, 444:25–445:5; and (3) the "black case," used either for a pipe bender or a gun, was never entered into evidence. *See* J.A. 702:25–703:3.

On September 21, 2020, Bullard applied for a search warrant to search the property at 117 Keystone Drive. When agents executed the search, they learned for the first time that other people lived in the building. Despite this, Bullard and Special Agent Asa M. Gravely failed to update the later warrant applications on September 30, 2020, and February 10, 2022, to reflect that discovery. *See* J.A. 82–103. The district court found that although the affidavits contained misrepresentations and omissions, "these were careless errors and not intended to mislead the magistrate judge." J.A. 862–63. The court further

16

determined that without the misrepresentations, the warrants were supported by probable cause.  J.A. 863.

Bolling's arguments as to each of the disputed pieces of evidence are unpersuasive. The footage from the pole camera and the neighbor's DVR was all lost or unrecoverable.[4] Because none of the footage was ever reviewed or recovered, Bolling has failed to demonstrate that such footage had "apparent" exculpatory value or that officers destroyed evidence in bad faith.  *See Johnson*, 996 F.3d at 206.

Bolling's arguments about the black case also fail.  McNees testified that he was unaware of the ATF ever possessing the case.  J.A. 702:25–703:3.  Moreover, to the extent that the black case was exculpatory, Bolling could have used photos of the case to make the same argument.  He has similarly failed to demonstrate bad faith by law enforcement as to this piece of evidence.  *See Johnson*, 996 F.3d at 206.

Finally, Bolling's contention that the pre-search video "would likely provide additional impeachment material" is merely speculative and therefore insufficient to satisfy *Brady*'s requirements.  *See Caro*, 597 F.3d at 619.

Bolling's arguments for a *Franks* hearing as to the affidavits used to apply for the search warrants also fail.  In support of the initial warrant, Bullard testified that he checked

---

[4] At trial, Agent Bullard testified that footage from the pole camera was not recovered either because the camera was never recording, or the footage was lost when the ATF servers malfunctioned.  J.A. 565:12–16.  Special Agent Sean McNees confirmed that nothing was recorded on the pole camera and "it was only up for two days."  J.A. 771.  As for the DVR footage, Agent Bullard testified that agents "intended to extract data from" the neighbor's DVR, but failed.  J.A. 444:18–22.  To his knowledge, the footage from the DVR was never reviewed.  J.A. 444:25–445:5.

17

property records, discussed the property with the confidential informant, listened to jail calls between Bolling and his wife, and attempted to secure a mail watch on the property. Based on this information, Bullard believed and represented that Bolling was the owner and occupant of the entire premises at 117 Keystone Drive. No evidence supports a finding that Bullard acted with reckless disregard for the truth, omitted material facts, or acted intentionally when he made this representation. *See Pulley*, 987 F.3d at 376.

True, Bullard and Gravely failed to update subsequent warrant applications to reflect the fact that other occupants lived at the 117 Keystone Drive property, that narcotics were not found on the property, and that agents did not find a safe with twenty guns, as represented by the confidential informant. But negligence and carelessness by the agents does not rise to the level of requiring a *Franks* hearing. *Pulley*, 987 F.3d at 377 (quoting *Franks*, 438 U.S. at 171).

Moreover, setting aside the inaccurate statements about the property in the second and third warrant applications to search the phone, law enforcement would nonetheless have had probable cause. The affidavits represented the following: (1) a confidential informant told law enforcement that he had witnessed drugs and firearms inside Bolling's residence, *see* J.A. 96–97; (2) on September 16, 2020, this confidential informant purchased methamphetamine from Bolling through a controlled buy, *see* J.A. 99–101; (3) three days later, the phone was seized from the car in which Bolling was found with fentanyl, methamphetamine, distribution materials, ammunition, and cash, *see* J.A. 101; (4) after Bolling was arrested, he was recorded on a jail call asking his wife to "remotely delete the contents of his cell phone," *see* J.A. 102; and (5) based on his training and

experience, Gravely believed that evidence of Bolling's drug-related activities remained on the "memory of the phone," *see* J.A. 102. These representations are enough to establish probable cause to search the phone. Accordingly, the district court properly denied Bolling's motion for a *Franks* hearing.

V.

Bolling also disputes the district court's denial of his motion to strike a juror, arguing that the district court's failure to exclude an allegedly "partial juror" violated his Sixth Amendment right to an impartial jury.

"District courts enjoy 'very broad discretion in deciding whether to excuse a juror for cause.' " *United States v. Odum*, 65 F.4th 714, 723 (4th Cir. 2023) (citing *Poynter by Poynter v. Ratcliff*, 874 F.2d 219, 222 (4th Cir. 1989)). This court will uphold a district court's decisions "absent 'manifest abuse of that discretion.' " *Id.*

"In selecting a jury, the trial judge is in the best position to make judgments about the impartiality and credibility of potential jurors based on the judge's own evaluations of responses to questions." *United States v. Jones*, 716 F.3d 851, 857 (4th Cir. 2013) (quoting *United States v. Cabrera-Beltran*, 660 F.3d 742, 749 (4th Cir. 2011)). When considering whether to impanel a juror who indicates that they have preconceived notions as to the innocence or guilt of a defendant, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* (quoting *Murphy v. Florida*, 421 U.S. 794, 800 (1975)). "Although a juror's avowal of impartiality is not dispositive, 'if a district court views juror assurances of continued impartiality to be

19

credible, the court may rely upon such assurances in deciding whether a defendant has satisfied the burden of proving actual prejudice.' " *Id.* (first citing *Murphy*, 421 U.S. at 800; and then quoting *United States v. Corrado*, 304 F.3d 593, 603 (6th Cir. 2002)). When a defendant fails to "cast doubt" on a juror's "assurance that she could set aside any opinion she may have had on the case, we defer to the district court's determination that she could serve impartially." *Id.* (internal citation omitted).

During voir dire, Juror No. 32 responded affirmatively when asked whether she or any member of her immediate family or any close personal friend had ever been arrested or prosecuted for a criminal charge. Juror No. 32 explained that her best friend's son was arrested "on several charges pertaining to drugs as well as breaking and entering." J.A. 504:16–18. Juror No. 32 was asked whether her involvement with her best friend's son would impact her ability to fairly and impartially consider the evidence that may relate to drugs and responded, "[y]es, it would affect it." J.A. 504:19–23.

Defense counsel noted during discussion that Juror No. 32 "g[a]ve an indication that she thought she could put it aside, but it didn't appear to [him] when questioning that she could." J.A. 506:12–16. The Government noted that they "ha[d] an awful lot of strikes for cause" and the district court noted "we're in trouble." J.A. 506:22–24. The court then stated, "I don't think I can have the fact we're in trouble on numbers impact my ruling on challenges for cause." J.A. 507:1–2.

On further questioning, Juror No. 32 was asked whether her best friend's son's involvement with drugs would impact her view on the case, and she responded, "yes, it would impact it." J.A. 508:4–8. Defense counsel then asked Juror No. 32 "[n]ow, do you

20

think that you could be fair and impartial if you were instructed to set that aside, or do you feel that is something that would just be a very strong fact factor for you?" J.A. 508:9–12. Before she could answer, the court said, "Let me put the question this way. If I instructed you to take that completely out of your mind and judge this case based on the evidence you hear in the courtroom and the Court's instructions as to the law, do you think you could do that?" J.A. 508:13–17. Juror No. 32 responded, "[y]es, sir." J.A. 508:18. Defense counsel challenged Juror No. 32, and the court denied the challenge based on his questioning. J.A. 508:23–509:1. After the court ruled on challenges to other jurors, it stated, "[t]hat takes us down to 31, which is the number we need." J.A. 508:23–509:1.

Although Juror No. 32 stated that her perspective could be influenced by her best friend's son's experience with drugs, the district court asked whether she could be impartial, and it was satisfied with her "avowal of impartiality." *See Jones*, 716 F.3d at 857. We therefore credit the district court's credibility determination and affirm the denial of Bolling's motion to strike for cause. *See id.* Because Bolling failed to "cast doubt" about whether Juror No. 32 could set aside her stated bias and serve impartially, the district court did not abuse its discretion by denying Bolling's motion to strike the juror.

## VI.

Finally, Bolling challenges the district court's denial of his *Bruen*-based motion to dismiss two of the firearm-related charges under 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Bolling argues on appeal that the plain text of the Second Amendment protects his right to possess firearms.

21

"We review the district court's factual findings on a motion to dismiss an indictment for clear error, but we review its legal conclusions *de novo*." *United States v. Perry*, 92 F.4th 500, 513 (4th Cir. 2024) (quoting *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014)).

A facial challenge to the constitutionality of a statute is the " 'most difficult challenge to mount successfully[]' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid,' " *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)), or that "the statute lacks any 'plainly legitimate sweep,' " *Bianchi v. Brown*, 111 F.4th 438, 452 (4th Cir. 2024) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)). The Supreme Court has consistently upheld the presumptive lawfulness of prohibitions on the possession of firearms by felons. *See District of Columbia v. Heller*, 554 U.S. 570, 626, 627 n.26 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); *United States v. Rahimi*, 602 U.S. 680, 699 (2024). This court has followed suit. *See United States v. Moore*, 666 F.3d 313, 316–17 (4th Cir. 2012) (collecting cases); *United States v. Canada*, 123 F.4th 159, 161–62 (4th Cir. 2024). We decline to change course under these circumstances. Accordingly, the district court's denial of Bolling's *Bruen*-based motion to dismiss Counts Five and Six is affirmed.

22

VII.

Bolling has raised numerous challenges at each step of his case. Because the district court correctly rejected each challenge, the district court's denial of each of the contested motions is

*AFFIRMED*.